# MILLER *v.* ALBRIGHT, SECRETARY OF STATE

No. 96–1060.   Argued November 4, 1997—Decided April 22, 1998

422

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., joined.  O'CONNOR, J., filed an opinion concurring in the judgment, in which KENNEDY, J., joined, *post*, p. 445.  SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 452.  GINSBURG, J., filed a dissenting opinion, in which SOUTER and BREYER, JJ., joined, *post*, p. 460.  BREYER, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined, *post*, p. 471.

*Donald Ross Patterson* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Kneedler* argued the cause for respondent.  With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Edward C. DuMont, Michael Jay Singer,* and *John S. Koppel.**

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE joins.

There are "two sources of citizenship, and two only: birth and naturalization."  *United States* v. *Wong Kim Ark,* 169 U. S. 649, 702 (1898).  Within the former category, the Fourteenth Amendment of the Constitution guarantees that every person "born in the United States, and subject to the

---

*\*Walter A. Smith, Jr., Steven R. Shapiro, Lucas Guttentag, Sara L. Mandelbaum,* and *Martha Davis* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." 169 U. S., at 702. Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress. *Id.*, at 703.

The petitioner in this case challenges the constitutionality of the statutory provisions governing the acquisition of citizenship at birth by children born out of wedlock and outside of the United States. The specific challenge is to the distinction drawn by § 309 of the Immigration and Nationality Act (INA), 66 Stat. 238, as amended, 8 U. S. C. § 1409, between the child of an alien father and a citizen mother, on the one hand, and the child of an alien mother and a citizen father, on the other. Subject to residence requirements for the citizen parent, the citizenship of the former is established at birth; the citizenship of the latter is not established unless and until either the father or his child takes certain affirmative steps to create or confirm their relationship. Petitioner contends that the statutory requirement that those steps be taken while the child is a minor violates the Fifth Amendment because the statute contains no limitation on the time within which the child of a citizen mother may prove that she became a citizen at birth.

We find no merit in the challenge because the statute does not impose any limitation on the time within which the members of either class of children may prove that they qualify for citizenship. It does establish different qualifications for citizenship for the two classes of children, but we are persuaded that the qualifications for the members of each of those classes, so far as they are implicated by the facts of this case, are well supported by valid governmental interests. We therefore conclude that the statutory distinction is neither arbitrary nor invidious.

I

Petitioner was born on June 20, 1970, in Angeles City, Republic of the Philippines. The records of the Local Civil

Registrar disclose that her birth was registered 10 days later, that she was named Lorena Peñero, that her mother was Luz Peñero, a Filipino national, and that her birth was "illegitimate." Spaces on the form referring to the name and the nationality of the father are blank.

Petitioner grew up and received her high school and college education in the Philippines. At least until after her 21st birthday, she never lived in the United States. App. 19. There is no evidence that either she or her mother ever resided outside of the Philippines.[1]

Petitioner's father, Charlie Miller, is an American citizen residing in Texas.[2] He apparently served in the United States Air Force and was stationed in the Philippines at the time of petitioner's conception. *Id.*, at 21. He never married petitioner's mother, and there is no evidence that he was in the Philippines at the time of petitioner's birth or that he ever returned there after completing his tour of duty. In 1992, Miller filed a petition in a Texas court to establish his relationship with petitioner. The petition was unopposed and the court entered a "Voluntary Paternity Decree" finding him "to be the biological and legal father of Lorelyn Penero Miller." The decree provided that "[t]he parent-child relationship is created between the father and the child as if the child were born to the father and mother during marriage." App. to Pet. for Cert. 38.

---

[1] Her mother was born in Leyte. Several years after petitioner's birth, her mother married a man named Frank Raspotnik and raised a family in Angeles City. App. 22.

[2] Although there is no formal finding that his paternity has been established by clear and convincing evidence, it is undisputed. In a letter to petitioner's attorney, the State Department acknowledged that it was "satisfied that Mr. Charlie R. Miller, the putative father, is a U. S. citizen, that he possesses sufficient physical presence in the United States to transmit citizenship, and that there is sufficient evidence that he had access to the applicant's mother at the probable time of conception." App. to Pet. for Cert. 32–33.

In November 1991, petitioner filed an application for registration as a United States citizen with the State Department. The application was denied in March 1992, and petitioner reapplied after her father obtained the paternity decree in Texas in July 1992. The reapplication was also denied on the ground that the Texas decree did not satisfy "the requirements of Section 309(a)(4) INA, which requires that a child born out of wedlock be legitimated before age eighteen in order to acquire U. S. citizenship under Section 301(g) INA (formerly Section 301(a)(7) INA)." *Id.*, at 33. In further explanation of its reliance on § 309(a)(4), the denial letter added: "Without such legitimation before age eighteen, there is no legally recognized relationship under the INA and the child acquires no rights of citizenship through an American citizen parent."[3]  *Ibid.*

## II

In 1993, petitioner and her father filed an amended complaint against the Secretary of State in the United States District Court for the Eastern District of Texas, seeking a judgment declaring that petitioner is a citizen of the United States and that she therefore has the right to possess an American passport. They alleged that the INA's different treatment of citizen mothers and citizen fathers violated Mr. Miller's "right to equal protection under the laws by utilizing the suspect classification of gender without justification." App. 11. In response to a motion to dismiss filed by the

---

[3] The comment, of course, related only to cases in which the child born out of wedlock claims citizenship through her father. Moreover, the reference to age 18 was inaccurate; petitioner was born prior to 1986, when § 309(a) was amended to change the relevant age from 21 to 18, see Pub. L. 99–653, § 13, 100 Stat. 3657, and she falls within a narrow age bracket whose members may elect to have the preamendment law apply, see note following 8 U. S. C. § 1409 (Effective Date of 1986 Amendment) (quoting § 23(e), as added, Pub. L. 100–525, § 8(r), 102 Stat. 2619). This oversight does not affect her case, however, because she was over 21 when the Texas decree was entered.

Government, the District Court concluded that Mr. Miller did not have standing and dismissed him as a party. Because venue in Texas was therefore improper, see 28 U. S. C. § 1391(e), the court transferred the case to the District Court for the District of Columbia, the site of the Secretary's residence. The Government renewed its motion in that forum, and that court concluded that even though petitioner had suffered an injury caused by the Secretary's refusal to register her as a citizen, the injury was not "redressable" because federal courts do not have the power to "grant citizenship." 870 F. Supp. 1, 3 (1994) (citing *INS* v. *Pangilinan,* 486 U. S. 875, 884 (1988)).

The Court of Appeals for the District of Columbia Circuit affirmed, but on different grounds. It first held that petitioner does have standing to challenge the constitutionality of 8 U. S. C. § 1409(a). If her challenge should succeed, the court could enter a judgment declaring that she was already a citizen pursuant to other provisions of the INA. 96 F. 3d 1467, 1470 (1996). On the merits, however, the court concluded that the requirements imposed on the "illegitimate" child of an American citizen father, but not on the child of a citizen mother, were justified by the interest in fostering the child's ties with this country. It explained:

> "[W]e conclude, as did the Ninth Circuit, that 'a desire to promote early ties to this country and to those relatives who are citizens of this country is not a[n ir]rational basis for the requirements made by' sections 1409(a)(3) and (4). *Ablang* [v. *Reno*], 52 F. 3d at 806. Furthermore, we find it entirely reasonable for Congress to require special evidence of such ties between an illegitimate child and its father. A mother is far less likely to ignore the child she has carried in her womb than is the natural father, who may not even be aware of its existence. As the Court has recognized, 'mothers and fathers of illegitimate children are not similarly situated.' *Parham* v. *Hughes,* 441 U. S. 347, 355 (1979).

'The putative father often goes his way unconscious of the birth of the child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother.' *Id.* at 355 n. 7 (internal quotation marks and citation omitted). This sex-based distinction seems especially warranted where, as here, the applicant for citizenship was fathered by a U. S. serviceman while serving a tour of duty overseas." *Id.*, at 1472.

Judge Wald concurred in the judgment despite her opinion that there is "no rational basis for a law that requires a U. S. citizen father, but not a U. S. citizen mother, to formally legitimate a child before she reaches majority as well as agree in writing to provide financial support until that date or forever forfeit the right to transmit citizenship." *Id.*, at 1473. While she agreed that "requiring some sort of minimal 'family ties' between parent and child, as well as fostering an early connection between child and country, is rational government policy," she did not agree that those goals justify "a set of procedural hurdles for men—and only men—who wish to confer citizenship on their children." *Id.*, at 1474. She nevertheless regretfully concurred in the judgment because she believed that our decision in *Fiallo* v. *Bell*, 430 U. S. 787 (1977), required the court to uphold the constitutionality of § 1409. 96 F. 3d, at 1473.

We granted certiorari to address the following question:

"Is the distinction in 8 U. S. C. § 1409 between 'illegitimate' children of United States citizen mothers and 'illegitimate' children of United States citizen fathers a violation of the Fifth Amendment to the United States Constitution?" 520 U. S. 1208 (1997).

## III

Before explaining our answer to the single question that we agreed to address, it is useful to put to one side certain

issues that need not be resolved. First, we need not decide whether *Fiallo* v. *Bell* dictates the outcome of this case, because that case involved the claims of several aliens to a special immigration preference, whereas here petitioner claims that she is, and for years has been, an American citizen.[4] Additionally, *Fiallo* involved challenges to the statutory distinctions between "illegitimate" and "legitimate" children, which are not encompassed in the question presented in this case and which we therefore do not consider.

The statutory provision at issue in this case, 8 U. S. C. § 1409, draws two types of distinctions between citizen fathers and citizen mothers of children born out of wedlock. The first relates to the class of unmarried persons who may transmit citizenship at birth to their offspring, and the second defines the affirmative steps that are required to transmit such citizenship.

With respect to the eligible class of parents, an unmarried father may not transmit his citizenship to a child born abroad to an alien mother unless he satisfies the residency require-

---

[4] The sections of the INA challenged in *Fiallo* defined the terms "child" and "parent," which determine eligibility for the special preference immigration status accorded to the "children" and "parents" of United States citizens and lawful permanent residents. *Fiallo* v. *Bell*, 430 U. S. 787, 788–789 (1977). "'Child'" was defined to include "'an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother.'" *Id.*, at 788–789, n. 1 (quoting 8 U. S. C. § 1101(b)(1)(D) (1976 ed.)). Thus, the statute did not permit an illegitimate child to seek preference by virtue of relationship with its citizen or resident father, nor could an alien father seek preference based on his illegitimate child's citizenship or residence. 430 U. S., at 789. Following this Court's decision in *Fiallo* upholding those provisions, in 1986 Congress amended the INA to recognize "child" and "parent" status where the preference is sought based on the relationship of a child born out of wedlock to its natural father "if the father has or had a bona fide parent-child relationship with the person." Pub. L. 99–603, § 315(a), 100 Stat. 3439, as amended, 8 U. S. C. § 1101(b)(1)(D) (1982 ed., Supp. IV).

ment in § 1401(g) that applies to a citizen parent who is married to an alien.[5] Under that provision, the citizen parent must have resided in the United States for a total of at least five years, at least two of which were after attaining the age of 14 years.[6] If the citizen parent is an unmarried mother, however, § 1409(c) rather than § 1401(g) applies; under that subsection she need only have had one year of continuous residence in the United States in order to confer citizenship on her offspring.[7] Since petitioner's father satisfied the residency requirement in § 1401(g), the validity of the distinction between that requirement and the unusually generous provision in § 1409(c) is not at issue.[8]

---

[5] See 8 U. S. C. § 1409(a) (directing that §§ 1401(c), (d), (e), (g) and 1408(2) "shall apply" if the specified conditions of § 1409(a) are met).

[6] Title 8 U. S. C. § 1401 provides:
"The following shall be nationals and citizens of the United States at birth:

.      .    .        .        .

"(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years . . . ."
Prior to its amendment in 1986, the section had required residence of 10 total years, at least 5 of which were after attaining the age of 14. See § 301(a)(7), 66 Stat. 236.

[7] Section 309(c) of the INA, codified in 8 U. S. C. § 1409(c), provides:
"(c) Notwithstanding the provision of subsection (a) of this section, a person born, after December 23, 1952, outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year."

[8] The Government has offered two explanations for the special rule applicable to unmarried citizen mothers who give birth abroad: first, an assumption that the citizen mother would probably have custody, and second,

As for affirmative steps, § 1409(a), as amended in 1986, imposes four requirements concerning unmarried citizen fathers that must be satisfied to confer citizenship "as of the date of birth" on a person born out of wedlock to an alien mother in another country. Citizenship for such persons is established if:

"(1) a blood relationship between the person and the father is established by clear and convincing evidence,

"(2) the father had the nationality of the United States at the time of the person's birth,

"(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

"(4) while the person is under the age of 18 years—

"(A) the person is legitimated under the law of the person's residence or domicile,

"(B) the father acknowledges paternity of the person in writing under oath, or

"(C) the paternity of the person is established by adjudication of a competent court." 8 U. S. C. § 1409(a).

Only the second of these four requirements is expressly included in § 1409(c), the provision applicable to unwed citizen mothers. See n. 7, *supra*. Petitioner, relying heavily on Judge Wald's separate opinion below, argues that there is no rational basis for imposing the other three requirements on children of citizen fathers but not citizen mothers. The first requirement is not at issue here, however, because the Government does not question Mr. Miller's blood relationship with petitioner.

---

that in most foreign countries the nationality of an illegitimate child is that of the mother unless paternity has been established. The Government submits that the special rule would minimize the risk that such a child might otherwise be stateless. See Brief for Respondent 32–34.

Moreover, even though the parties have disputed the validity of the third condition[9]—and even though that condition is repeatedly targeted in JUSTICE BREYER's dissent—we need not resolve that debate because it is unclear whether the requirement even applies in petitioner's case; it was added in 1986, after her birth, and she falls within a special interim provision that allows her to elect application of the preamendment § 1409(a), which required only legitimation before age 21. See n. 3, *supra.* And even if the condition did apply to her claim of citizenship, the State Department's refusal to register petitioner as a citizen was expressly based on § 1409(a)(4). Indeed, since that subsection is written in the disjunctive, it is only necessary to uphold the least onerous of the three alternative methods of compliance to sustain the Government's position. Thus, the only issue presented by the facts of this case is whether the requirement in § 1409(a)(4)—that children born out of wedlock to citizen fathers, but not citizen mothers, obtain formal proof of paternity by age 18, either through legitimation, written acknowledgment by the father under oath, or adjudication by a competent court—violates the Fifth Amendment.

It is of significance that the petitioner in this case, unlike the petitioners in *Fiallo*, see 430 U. S., at 790, and n. 3, is not challenging the denial of an application for special status. She is contesting the Government's refusal to register and treat her as a citizen. If she were to prevail, the judgment in her favor would confirm her pre-existing citizenship rather than grant her rights that she does not now possess.

---

[9] The Government asserts that the purpose of § 1409(a)(3) is " 'to facilitate the enforcement of a child support order and, thus, lessen the chance that the child could become a financial burden to the states.' " Brief for Respondent 25–26, n. 13 (quoting Hearings on H. R. 4823 et al. before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 99th Cong., 2d Sess., 150 (1986) (statement of Joan M. Clark, Assistant Secretary of State for Consular Affairs) (hereinafter Hearings)).

We therefore agree with the Court of Appeals that she has standing to invoke the jurisdiction of the federal courts. See 96 F. 3d, at 1469–1470 (distinguishing *INS* v. *Pangilinan*, 486 U. S. 875 (1988)). Moreover, because her claim relies heavily on the proposition that her citizen father should have the same right to transmit citizenship as would a citizen mother, we shall evaluate the alleged discrimination against him as well as its impact on her. See, *e. g.*, *Craig* v. *Boren*, 429 U. S. 190, 193–197 (1976).[10]

## IV

Under the terms of the INA, the joint conduct of a citizen and an alien that results in conception is not sufficient to produce an American citizen, regardless of whether the citizen parent is the male or the female partner. If the two parties engage in a second joint act—if they agree to marry one another—citizenship will follow. The provision at issue in this case, however, deals only with cases in which no relevant joint conduct occurs after conception; it determines the ability of each of those parties, acting separately, to confer citizenship on a child born outside of the United States.

If the citizen is the unmarried female, she must first choose to carry the pregnancy to term and reject the alternative of abortion—an alternative that is available by law to many, and in reality to most, women around the world. She must then actually give birth to the child. Section 1409(c) re-

---

[10] As a threshold matter, the Government now argues—though it never asserted this position below or in opposition to certiorari—that an alien outside the territory of the United States "has no substantive rights cognizable under the Fifth Amendment." Brief for Respondent 11–12. Even if that is so, the question to be decided is whether petitioner is such an alien or whether, as she claims, she is a citizen. Thus, we must address the merits to determine whether the predicate for this argument is accurate. In the cases on which the Government relies, *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), and *United States* v. *Verdugo-Urquidez*, 494 U. S. 259 (1990), it was perfectly clear that the complaining aliens were not citizens or nationals of the United States.

wards that choice and that labor by conferring citizenship on her child.

If the citizen is the unmarried male, he need not participate in the decision to give birth rather than to choose an abortion; he need not be present at the birth; and for at least 17 years thereafter he need not provide any parental support, either moral or financial, to either the mother or the child, in order to preserve his right to confer citizenship on the child pursuant to § 1409(a). In order retroactively to transmit his citizenship to the child as of the date of the child's birth, all that § 1409(a)(4) requires is that he be willing and able to acknowledge his paternity in writing under oath while the child is still a minor. 8 U. S. C. § 1409(a)(4)(B). In fact, § 1409(a)(4) requires even less of the unmarried father— that provision is alternatively satisfied if, before the child turns 18, its paternity "is established by adjudication of a competent court." § 1409(a)(4)(C). It would appear that the child could obtain such an adjudication absent any affirmative act by the father, and perhaps even over his express objection.

There is thus a vast difference between the burdens imposed on the respective parents of potential citizens born out of wedlock in a foreign land. It seems obvious that the burdens imposed on the female citizen are more severe than those imposed on the male citizen by § 1409(a)(4), the only provision at issue in this case. It is nevertheless argued that the male citizen and his offspring are the victims of irrational discrimination because § 1409(a)(4) is the product of " 'overbroad stereotypes about the relative abilities of men and women.' " Brief for Petitioner 8. We find the argument singularly unpersuasive.[11]

---

[11] Though petitioner claims to be a citizen from birth, rather than claiming an immigration preference, citizenship does not pass by descent. *Rogers* v. *Bellei*, 401 U. S. 815, 830 (1971). Thus she must still meet the statutory requirements set by Congress for citizenship. *Id.*, at 828–830; *United States* v. *Ginsberg*, 243 U. S. 472, 474 (1917). Deference to the

Insofar as the argument rests on the fact that the male citizen parent will "forever forfeit the right to transmit citizenship" if he does not come forward while the child is a minor, whereas there is no limit on the time within which the citizen mother may prove her blood relationship, the argument overlooks the difference between a substantive condition and a procedural limitation. The substantive conduct of the unmarried citizen mother that qualifies her child for citizenship is completed at the moment of birth; the relevant conduct of the unmarried citizen father or his child may occur at any time within 18 years thereafter. There is, however, no procedural hurdle that limits the time or the method by which either parent (or the child) may provide the State Department with evidence that the necessary steps were taken to transmit citizenship to the child.

The substantive requirement embodied in § 1409(a)(4) serves, at least in part, to ensure that a person born out of wedlock who claims citizenship by birth actually shares a blood relationship with an American citizen. As originally enacted in 1952, § 1409(a) required simply that "the paternity of such child [born out of wedlock] is established while such child is under the age of twenty-one years by legitimation." 66 Stat. 238. The section offered no other means of proving a biological relationship. In 1986, at the same time that it modified the INA provisions at issue in *Fiallo* in favor of unmarried fathers and their out-of-wedlock children, see n. 4, *supra,* Congress expanded § 1409(a) to allow the two other alternatives now found in subsections (4)(B) and (4)(C).

---

political branches dictates "a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Mathews* v. *Diaz,* 426 U. S. 67, 82 (1976). Even if, as petitioner and her *amici* argue, the heightened scrutiny that normally governs gender discrimination claims applied in this context, see *United States* v. *Virginia,* 518 U. S. 515, 532–534 (1996), we are persuaded that the requirement imposed by § 1409(a)(4) on children of unmarried male, but not female, citizens is substantially related to important governmental objectives.

Pub. L. 99–653, § 13, 100 Stat. 3657. The purpose of the amendment was to "simplify and facilitate determinations of acquisition of citizenship by children born out of wedlock to an American citizen father, by eliminating the necessity of determining the father's residence or domicile and establishing satisfaction of the legitimation provisions of the jurisdiction." Hearings, at 150. The 1986 amendment also added § 1409(a)(1), which requires paternity to be established by clear and convincing evidence, in order to deter fraudulent claims; but that standard of proof was viewed as an ancillary measure, not a replacement for proof of paternity by legitimation or a formal alternative. See *id.*, at 150, 155.

There is no doubt that ensuring reliable proof of a biological relationship between the potential citizen and its citizen parent is an important governmental objective. See *Trimble* v. *Gordon*, 430 U. S. 762, 770–771 (1977); *Fiallo*, 430 U. S., at 799, n. 8. Nor can it be denied that the male and female parents are differently situated in this respect. The blood relationship to the birth mother is immediately obvious and is typically established by hospital records and birth certificates; the relationship to the unmarried father may often be undisclosed and unrecorded in any contemporary public record. Thus, the requirement that the father make a timely written acknowledgment under oath, or that the child obtain a court adjudication of paternity, produces the rough equivalent of the documentation that is already available to evidence the blood relationship between the mother and the child. If the statute had required the citizen parent, whether male or female, to obtain appropriate formal documentation within 30 days after birth, it would have been "gender-neutral" on its face, even though in practical operation it would disfavor unmarried males because in virtually every case such a requirement would be superfluous for the mother. Surely the fact that the statute allows 18 years in which to provide evidence that is comparable to what the

mother provides immediately after birth cannot be viewed as discriminating against the father or his child.

Nevertheless, petitioner reiterates the suggestion that it is irrational to require a formal act such as a written acknowledgment or a court adjudication because the advent of reliable genetic testing fully addresses the problem of proving paternity, and subsection (a)(1) already requires proof of paternity by clear and convincing evidence. See 96 F. 3d, at 1474. We respectfully disagree. Nothing in subsection (a)(1) requires the citizen father or his child to obtain a genetic paternity test. It is difficult, moreover, to understand why signing a paternity acknowledgment under oath prior to the child's 18th birthday is more burdensome than obtaining a genetic test, which is relatively expensive,[12] normally requires physical intrusion for both the putative father and child,[13] and often is not available in foreign countries.[14] Congress could fairly conclude that despite recent scientific advances, it still remains preferable to require some formal legal act to establish paternity, coupled with a clear-and-convincing evidence standard to deter fraud. The time limi-

---

[12] See 7 U. S. Dept. of State, Foreign Affairs Manual § 1131.5-4(c) (1996) (hereinafter Foreign Affairs Manual). Commercially available testing in the United States presently appears to cost between about $450 to $600 per test. See Hotaling, Is He or Isn't He?, Los Angeles Times Magazine, Sept. 7, 1997, pp. 36, 54 (hereinafter Hotaling); Mirabella, Lab's Tests Give Answers to Genetic Questions, Baltimore Sun, Nov. 25, 1997, pp. 1C, 8C, cols. 2, 4 (hereinafter Mirabella).

[13] Laboratories that conduct genetic paternity testing typically use either blood samples or cells scraped from the inside of the cheek of the putative father, the child, and often the mother as well. See, e. g., 1 D. Faigman, D. Kaye, M. Saks, & J. Sanders, Modern Scientific Evidence §§ 19-2.2, 19-2.7.1, pp. 761, 763, 775 (1997); Hotaling 36, 54; Mirabella, at 8C, cols. 2, 4.

[14] The State Department has observed that "the competence, integrity, and availability of blood testing physicians and facilities vary around the world." 7 Foreign Affairs Manual § 1131.5-4(c). There are presently about 75 DNA testing laboratories in the United States, 51 of which are accredited by the American Association of Blood Banks. Hotaling 36.

tation, in turn, provides assurance that the formal act is based upon reliable evidence, and also deters fraud.[15] Congress is of course free to revise its collective judgment and permit genetic proof of paternity rather than requiring some formal legal act by the father or a court,[16] but the Constitution does not now require any such change.

Section 1409 also serves two other important purposes that are unrelated to the determination of paternity: the interest in encouraging the development of a healthy relationship between the citizen parent and the child while the child is a minor; and the related interest in fostering ties between the foreign-born child and the United States. When a child is born out of wedlock outside of the United States, the citizen mother, unlike the citizen father, certainly knows of her child's existence and typically will have custody of the child immediately after the birth. Such a child thus has the opportunity to develop ties with its citizen mother at an early age, and may even grow up in the United States if the mother returns. By contrast, due to the normal interval of nine months between conception and birth, the unmarried father may not even know that his child exists, and the child may not know the father's identity. Section 1409(a)(4) requires a relatively easy, formal step by either the citizen father or his child that shows beyond doubt that at least one of the two knows of their blood relationship, thus assuring at least the opportunity for them to develop a personal relationship.

The facts of this very case provide a ready example of the concern. Mr. Miller and petitioner both failed to take any steps to establish a legal relationship with each other before

---

[15] Once a child reaches the legal age of majority, a male citizen could make a fraudulent claim of paternity on the person's behalf without any risk of liability for child support.

[16] In a different context Congress has already recognized the value of genetic paternity testing. See 96 F. 3d 1467, 1474–1475 (CADC 1996) (discussing Child Support Enforcement Amendments of 1984).

petitioner's 21st birthday, and there is no indication in the record that they had any contact whatsoever before she applied for a United States passport. Given the size of the American military establishment that has been stationed in various parts of the world for the past half century, it is reasonable to assume that this case is not unusual. In 1970, when petitioner was born, about 683,000 service personnel were stationed in the Far East, 24,000 of whom were in the Philippines. U. S. Dept. of Commerce, Statistical Abstract of the United States 381 (99th ed. 1978). Of all Americans in the military at that time, only one percent were female.[17] These figures, coupled with the interval between conception and birth and the fact that military personnel regularly return to the United States when a tour of duty ends, suggest that Congress had legitimate concerns about a class of children born abroad out of wedlock to alien mothers and to American servicemen who would not necessarily know about, or be known by, their children. It was surely reasonable when the INA was enacted in 1952, and remains equally reasonable today, for Congress to condition the award of citizenship to such children on an act that demonstrates, at a minimum, the possibility that those who become citizens will develop ties with this country—a requirement that performs a meaningful purpose for citizen fathers but normally would be superfluous for citizen mothers.

It is of course possible that any child born in a foreign country may ultimately fail to establish ties with its citizen parent and with this country, even though the child's citizen parent has engaged in the conduct that qualifies the child for citizenship. A citizen mother may abandon her child before

---

[17] Office of the Assistant Secretary of Defense, Background Study, Use of Women in the Military 5 (2d ed. 1978). The proportion of military personnel who were female in 1970 had dropped from a high of 2.2 percent in 1945. *Id.*, at 3. Since 1970, the proportion has steadily increased to its present level of about 13 percent. See Dept. of Defense, Selected Manpower Statistics 23 (1996).

returning to the States, and a citizen father, even after acknowledging paternity, may die or abscond before his child has an opportunity to bond with him or visit this country. The fact that the interest in fostering ties with this country may not be fully achieved for either class of children does not qualify the legitimacy or the importance of that interest. If, as Congress reasonably may have assumed, the formal requirements in § 1409(a)(4) tend to make it just as likely that fathers will have the opportunity to develop a meaningful relationship with their children as does the fact that the mother knows of her baby's existence and often has custody at birth, the statute's effect will reduce, rather than aggravate, the disparity between the two classes of children.

We are convinced not only that strong governmental interests justify the additional requirement imposed on children of citizen fathers, but also that the particular means used in § 1409(a)(4) are well tailored to serve those interests. It is perfectly appropriate to require some formal act, not just any evidence that the father or his child know of the other's existence. Such a formal act, whether legitimation, written acknowledgment by the father, or a court adjudication, lessens the risk of fraudulent claims made years after the relevant conduct was required. As for the requirement that the formal act take place while the child is a minor, Congress obviously has a powerful interest in fostering ties with the child's citizen parent and the United States during his or her formative years. If there is no reliable, contemporaneous proof that the child and the citizen father had the opportunity to form familial bonds before the child turned 18, Congress reasonably may demand that the child show sufficient ties to this country on its own rather than through its citizen parent in order to be a citizen.[18]

---

[18] The same policy presently applies to foreign-born persons not eligible for citizenship at birth: A child may obtain special immigration preference and the immediate issuance of a visa based on a parent's citizenship or lawful residence, but only until age 21. 8 U. S. C. §§ 1101(b)(1), 1153(d).

Our conclusion that Congress may require an affirmative act by unmarried fathers and their children, but not mothers and their children, is directly supported by our decision in *Lehr* v. *Robertson*, 463 U. S. 248 (1983). That case involved a New York law that automatically provided mothers of "illegitimate" children with prior notice of an adoption proceeding and the right to veto an adoption, but only extended those rights to unmarried fathers whose claim of paternity was supported by some formal public act, such as a court adjudication, the filing of a notice of intent to claim paternity, or written acknowledgment by the mother. *Id.*, at 251–252, n. 5, 266. The petitioner in *Lehr*, an unmarried putative father, need only have mailed a postcard to the State's "putative father registry" to enjoy the same rights as the child's undisputed mother, *id.*, at 264, yet he argued that this gender-based requirement violated the Equal Protection Clause. We rejected that argument, and we find the comparable claim in this case, if anything, even less persuasive. Whereas the putative father in *Lehr* was deprived of certain rights because he failed to take some affirmative step within about two years of the child's birth (when the adoption proceeding took place), here the unfavorable gender-based treatment was attributable to Mr. Miller's failure to take appropriate action within 21 years of petitioner's birth *and* petitioner's own failure to obtain a paternity adjudication by a "competent court" before she turned 18.[19]

Even though the rule applicable to each class of children born abroad is eminently reasonable and justified by important Government policies, petitioner and her *amici* argue that § 1409 is unconstitutional because it is a "gender-based classification." We shall comment briefly on that argument.

---

[19] JUSTICE BREYER questions the relevance of *Lehr* because it was decided before advances in genetic testing, see *post*, at 487; there was, however, no question about the paternity of the father in that case. As in this case, the father there failed to act promptly to establish a relationship with his child.

## V

The words "stereotype," "stereotyping," and "stereotypical" are used repeatedly in petitioner's and her *amici's* briefs. They note that we have condemned statutory classifications that rest on the assumption that gender may serve as a proxy for relevant qualifications to serve as the administrator of an estate, *Reed* v. *Reed*, 404 U. S. 71 (1971), to engage in professional nursing, *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718 (1982), or to train for military service, *United States* v. *Virginia*, 518 U. S. 515 (1996), to name a few examples. Moreover, we have expressly repudiated cases that rested on the assumption that only the members of one sex could suitably practice law or tend bar. See *Hogan*, 458 U. S., at 725, n. 10 (commenting on *Bradwell* v. *State*, 16 Wall. 130 (1873), and *Goesaert* v. *Cleary*, 335 U. S. 464 (1948)). Discrimination that "is merely the accidental byproduct of a traditional way of thinking about females" is unacceptable. *Califano* v. *Goldfarb*, 430 U. S. 199, 223 (1977) (STEVENS, J., concurring in judgment).

The gender equality principle that was implicated in those cases is only indirectly involved in this case for two reasons.[20] First, the conclusion that petitioner is not a citizen rests on several coinciding factors, not just the gender of her citizen parent. On the facts of this case, even if petitioner's mother had been a citizen[21] and her father had been the alien, petitioner would not qualify for citizenship because her mother has never been to the United States. Alternatively, if her citizen parent had been a female member of the Air Force and, like Mr. Miller, had returned to the States at the end of her tour of duty, § 1409 quite probably would have been irrelevant and petitioner would have become a citizen at

---

[20] Of course, the sex of the person claiming citizenship is irrelevant; if she were a male, petitioner's case would be no stronger.

[21] Theoretically she might have been the child of an American soldier stationed in the Philippines during World War II. See *Ablang* v. *Reno*, 52 F. 3d 801, 802 (CA9 1995), cert. denied, 516 U. S. 1043 (1996).

birth by force of the Constitution itself.[22]    Second, it is not merely the sex of the citizen parent that determines whether the child is a citizen under the terms of the statute; rather, it is an event creating a legal relationship between parent and child—the birth itself for citizen mothers, but postbirth conduct for citizen fathers and their offspring.   Nevertheless, we may assume that if the classification in § 1409 were merely the product of an outmoded stereotype, it would be invalid.

The "gender stereotypes" on which § 1409 is supposedly premised are (1) "that the American father is never anything more than the proverbial breadwinner who remains aloof from day-to-day child rearing duties,"[23] and (2) "that a mother will be closer to her child born out of wedlock than a father will be to his."[24]    Even disregarding the statute's separate, nonstereotypical purpose of ensuring reliable proof of a blood relationship, neither of those propositions fairly reflects the justifications for the classification actually at issue.

Section 1409(a)(4) is not concerned with either the average father or even the average father of a child born out of wedlock.   It is concerned with a father (a) whose child was born in a foreign country, and (b) who is unwilling or unable to acknowledge his paternity, and whose child is unable or unwilling to obtain a court paternity adjudication.   A congressional assumption that such a father and his child are especially unlikely to develop a relationship, and thus to foster the child's ties with this country, has a solid basis even if we assume that all fathers who have made some effort to become acquainted with their children are as good, if not better, parents than members of the opposite sex.

---

[22] "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."    U. S. Const., Amdt. 14, § 1.

[23] Brief for American Civil Liberties Union et al. as *Amici Curiae* 8.

[24] 96 F. 3d, at 1473 (Wald, J., concurring in judgment).

444

Nor does the statute assume that all mothers of illegitimate children will necessarily have a closer relationship with their children than will fathers. It does assume that all of them will be present at the event that transmits their citizenship to the child, that hospital records and birth certificates will normally make a further acknowledgment and formal proof of parentage unnecessary, and that their initial custody will at least give them the opportunity to develop a caring relationship with the child. Section 1409(a)(4)—the only provision that we need consider—is therefore supported by the undisputed assumption that fathers are less likely than mothers to have the *opportunity* to develop relationships, not simply, as JUSTICE BREYER contends, *post*, at 482–483, that they are less likely to take advantage of that opportunity when it exists.[25] These assumptions are firmly grounded and adequately explain why Congress found it unnecessary to impose requirements on the mother that were entirely appropriate for the father.

None of the premises on which the statutory classification is grounded can be fairly characterized as an accidental byproduct of a traditional way of thinking about the mem-

---

[25] JUSTICE BREYER does not dispute the fact that the unmarried father of a child born abroad is less likely than the unmarried mother to have the opportunity to develop a relationship with the child. He nevertheless would replace the gender-based distinction with either a "knowledge of birth" requirement or a distinction between "Caretaker and Noncaretaker Parents." *Post*, at 487. Neither substitute seems a likely candidate for serious congressional consideration. The former in practice would be just as gender based as the present requirement, for surely every mother has knowledge of the birth when it occurs; nor would that option eliminate the need for formal steps and time limits to ensure that the parent truly had knowledge during the child's youth. The latter would be confusing at best, for JUSTICE BREYER does not tell us how he would decide whether a father like Mr. Miller would qualify as a "caretaker" or a "noncaretaker"; and it would also be far less protective of families than the present statute, for it would deny citizenship to out-of-wedlock children who have relationships with their citizen parents but are not in the primary care or custody of those parents.

bers of either sex. The biological differences between single men and single women provide a relevant basis for differing rules governing their ability to confer citizenship on children born in foreign lands. Indeed, it is the suggestion that simply because Congress has authorized citizenship at birth for children born abroad to unmarried mothers, it cannot impose any postbirth conditions upon the granting of citizenship to the foreign-born children of citizen fathers, that might be characterized as merely a byproduct of the strong presumption that gender-based legal distinctions are suspect. An impartial analysis of the relevant differences between citizen mothers and citizen fathers plainly rebuts that presumption.[26]

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY joins, concurring in the judgment.

This Court has long applied a presumption against third-party standing as a prudential limitation on the exercise of federal jurisdiction. Federal courts, we have held, "must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton* v. *Wulff*, 428 U. S. 106, 113 (1976); see also *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975). Contrary to this prudential rule, the principal opinion recognizes that petitioner has standing to raise an equal protection challenge to 8 U. S. C. § 1409. The statute, however, accords differential treatment to fathers and mothers, not to sons and daughters. Thus,

---

[26] See *Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 497–498, n. 4 (1981) (STEVENS, J., dissenting). JUSTICE SCALIA argues that petitioner's suit must be dismissed because the courts have "no power to provide the relief requested." *Post*, at 453. Because we conclude that there is no constitutional violation to remedy, we express no opinion on this question.

although petitioner is clearly injured by the fact that she has been denied citizenship, the *discriminatory* impact of the provision falls on petitioner's father, Charlie Miller, who is no longer a party to this suit. Consequently, I do not believe that we should consider petitioner's gender discrimination claim.

The principal opinion recognizes that petitioner's claim turns on "the proposition that her citizen father should have the same right to transmit citizenship as would a citizen mother" and resolves to "evaluate the alleged discrimination against [petitioner's father] as well as its impact on [petitioner]." *Ante*, at 433. But even when "the very same allegedly illegal act that affects the litigant also affects a third party," a plaintiff "cannot rest his claim to relief on the legal rights and interests of [the] third part[y]." *Department of Labor* v. *Triplett*, 494 U. S. 715, 720 (1990) (internal quotation marks omitted). A party raising a constitutional challenge to a statute must demonstrate not only "that the alleged unconstitutional feature [of the statute] injures him" but also that "he is within the class of persons with respect to whom the act is unconstitutional." *Heald* v. *District of Columbia*, 259 U. S. 114, 123 (1922). This requirement arises from the understanding that the third-party right-holder may not, in fact, wish to assert the claim in question, as well as from the belief that "third parties themselves usually will be the best proponents of their rights." *Singleton, supra*, at 113–114; see also *Holden* v. *Hardy*, 169 U. S. 366, 397 (1898).

In support of the decision to consider Charlie Miller's claim, both JUSTICE STEVENS, in the principal opinion, and JUSTICE BREYER, in dissent, cite *Craig* v. *Boren*, 429 U. S. 190 (1976). In that case, we allowed a vendor to challenge a state law that permitted sales of 3.2% beer to females who had reached the age of 18 but prohibited such sales to males until they turned 21. Because the law proscribed the sale rather than the consumption of beer, the Court determined

that a vendor was the "least awkward challenger" to the gender-based distinction. *Id.*, at 197. We reasoned that prudential objectives would not be served by rejecting third-party standing because "the lower court already ha[d] entertained the relevant constitutional challenge." *Id.*, at 193. Here, however, the court below expressly did *not* take account of Charlie Miller's equal protection rights, instead reviewing petitioner's challenge as a first-party claim of gender discrimination against the children of citizen fathers as opposed to the children of citizen mothers. See 96 F. 3d 1467, 1470 (CADC 1996).

More importantly, since this Court decided *Craig*, we have articulated the contours of the third-party standing inquiry in greater detail. In *Powers* v. *Ohio*, 499 U. S. 400 (1991), we stated that a litigant seeking to assert the rights of another party must satisfy three interrelated criteria: "The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.*, at 411 (internal quotation marks and citations omitted); see also *Campbell* v. *Louisiana, ante,* at 397–398. While it seems clear that petitioner has a significant stake in challenging the statute and a close relationship with her father, she has not demonstrated a substantial hindrance to her father's ability to assert his own rights. *Powers* and our earlier precedents suggest that the absence of such an obstacle precludes third-party standing. See 499 U. S., at 411 (explaining that "[all] three important criteria [must be] satisfied," *i. e.*, that there "must exist some hindrance to the third party's ability to protect his or her own interests" before the presumption is rebutted); see also *Singleton, supra,* at 116 ("Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply").

Petitioner has not demonstrated that Charlie Miller confronted a "genuine obstacle" to the assertion of his own rights that rises to the level of a hindrance. 428 U. S., at 116; see also *Barrows* v. *Jackson,* 346 U. S. 249, 257 (1953) (third-party standing accorded because it "would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court"). In fact, Charlie Miller originally filed suit and asserted his own rights but then opted not to pursue his claim throughout this litigation. It is true that he was wrongly dismissed from the action by the Eastern District of Texas, and that the Government made the misguided argument before that court that "[t]he rights, if any, which have been injured are those of Lorelyn Penero Miller, the true plaintiff in this action." See Motion to Dismiss Plaintiff's First Amended Complaint or, in the Alternative, to Transfer Venue 4. But because he failed to appeal the erroneous dismissal of his claim, any hindrance to the vindication of Charlie Miller's constitutional rights is ultimately self imposed.

I am reluctant to accept that the Government's litigation strategy, or an unfavorable ruling in the lower courts, could be a sufficiently severe obstacle to the assertion of a litigant's own rights to warrant an exception to our prudential standing requirements. Those requirements were adopted to serve the institutional interests of the federal courts, not the convenience of the litigants. See *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 231 (1990); *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 541 (1986). JUSTICE BREYER asserts that appeals take time and money, and that a change of venue left Charlie Miller uncertain where to appeal. See *post,* at 474. But the only obstacle was the inconvenience caused by the normal course of litigation, which often involves a transfer of venue. Charlie Miller never indicated any intent to challenge his dismissal from the suit, and there is no suggestion that he faced any unusual practical or legal barriers to filing a notice of appeal. Instituting a suit is it-

self burdensome—arguably as burdensome as filing an appeal from the denial of a claim—and to conclude that the course of events that transpired in this case constituted a hindrance to Charlie Miller's ability to assert his rights would be a step toward eliminating the hindrance prong altogether.

Thus far, we have permitted third-party standing only where more "daunting" barriers deterred the rightholder. *Powers, supra,* at 414. To take an extreme example, in *Hodel* v. *Irving,* 481 U. S. 704 (1987), we concluded that plaintiffs had third-party standing to assert the rights of their deceased parents. *Id.,* at 711–712. And in *Powers,* we noted that potential jurors are not parties to the proceeding, cannot easily obtain declaratory or injunctive relief from a prosecutor's exercise of peremptory challenges, would find it difficult to demonstrate a likelihood that discrimination against them would recur, and have economic disincentives to filing suit. 499 U. S., at 414–415. Privacy concerns may also provide a compelling explanation for a third party's absence from the litigation. In *Carey* v. *Population Services Int'l,* 431 U. S. 678 (1977), we determined that a vendor could challenge the law prohibiting the distribution of contraceptives to minors because the desire to avoid publicity would deter potential purchasers from defending their own rights. *Id.,* at 684, n. 4; see also *Eisenstadt* v. *Baird,* 405 U. S. 438, 446 (1972). Likewise, in *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449 (1958), the Court held that an organization could raise the privacy rights of its members because litigation initiated by those members would disclose their identity and destroy the very privacy they sought to protect. *Id.,* at 459. Where insurmountable procedural obstacles preclude a rightholder's own suit, the Court has also accorded third-party standing. In *Singleton,* we concluded that physicians could assert the rights of indigent women denied funding for abortion because imminent mootness prevented the women from bringing their claims. See 428 U. S., at 108. Simi-

larly, *Barrows* involved the constitutional rights of the prospective victims of a racially restrictive real estate covenant, who were unidentified and thus not before the Court. See 346 U. S., at 254. And in *Craig*, the case from which the Court garners its sole support for according third-party standing here, the named plaintiff turned 21 during the course of the litigation, which mooted his challenge to the beer-sale restriction. See 429 U. S., at 192.

Where legitimate obstacles such as these exist, which lie beyond the control of the rightholder, that party's absence from a suit more likely stems from disability than from disinterest. A hindrance signals that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so. See *Singleton, supra,* at 116 ("If there is some genuine obstacle . . . the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent"). Furthermore, where a hindrance impedes the assertion of a claim, the right likely will not be asserted—and thus the relevant law will not be enforced—unless the Court recognizes third-party standing. In *Barrows*, for example, the Court permitted third-party standing because "the reasons which underlie [the] rule denying standing to raise another's rights" were "outweighed by the need to protect the fundamental rights" which would otherwise have been denied. 346 U. S., at 257.

Moreover, in contrast to this case, the white property owner contesting the racially restrictive covenant in *Barrows* was its "only effective adversary" because she was "the one in whose charge and keeping repose[d] the power to continue to use her property to discriminate or to discontinue such use." *Id.,* at 259. Here, although we have an injured party before us, the party actually discriminated against is both best suited to challenging the statute and available to undertake that task. See *Gladstone, Realtors* v. *Village of*

*Bellwood*, 441 U. S. 91, 100 (1979) (prudential barriers seek "to limit access to the federal courts to those litigants best suited to assert a particular claim"). In light of petitioner's uncertain constitutional status and the potential problems with fashioning a remedy for her injury, see *post*, at 452–458 (SCALIA, J., concurring in judgment), allowing her to assert Charlie Miller's claim will likely dilute rather than protect his constitutional rights.

Although petitioner cannot raise her father's rights, she may raise her own. While it is unclear whether an alien may assert constitutional objections when he or she is outside the territory of the United States, see *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), and *United States* v. *Verdugo-Urquidez*, 494 U. S. 259 (1990), I will assume that petitioner may challenge the constitutionality of § 1409. Her challenge, however, triggers only rational basis scrutiny. As pointed out above, see *supra*, at 445, § 1409 does not draw a distinction based on the gender of the child, so petitioner cannot claim that she has been injured by gender discrimination. See *Allen* v. *Wright*, 468 U. S. 737, 755 (1984) (an injury arising from discrimination "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct") (internal quotation marks omitted). Moreover, the grant of certiorari was limited to the question whether § 1409 discriminates "between 'illegitimate' children of United States citizen mothers and 'illegitimate' children of United States citizen fathers," so any claim of discrimination based on differential treatment of illegitimate versus legitimate children is not presented. See 520 U. S. 1208 (1997).

Given that petitioner cannot raise a claim of discrimination triggering heightened scrutiny, she can argue only that § 1409 irrationally discriminates between illegitimate children of citizen fathers and citizen mothers. Although I do not share JUSTICE STEVENS' assessment that the provision withstands heightened scrutiny, *ante*, at 433–444, I believe

it passes rational scrutiny for the reasons he gives for sustaining it under the higher standard. It is unlikely, in my opinion, that any gender classifications based on stereotypes can survive heightened scrutiny, but under rational scrutiny, a statute may be defended based on generalized classifications unsupported by empirical evidence. See *Heller* v. *Doe*, 509 U. S. 312, 320 (1993) ("[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification" (internal quotation marks and citations omitted)). This is particularly true when the classification is adopted with reference to immigration, an area where Congress frequently must base its decisions on generalizations about groups of people.

\*     \*     \*

We adopted the presumption against third-party standing to preserve the court's "properly limited" role, *Warth*, 422 U. S., at 498, and we have identified a particular set of circumstances that will rebut that presumption. I believe that we should treat those considerations, in particular the hindrance prong, as meaningful criteria. Consequently, I would not accord petitioner standing to raise her father's claim of gender discrimination. Petitioner's own constitutional challenge triggers only rational basis scrutiny, and § 1409 is sustainable under that standard. Accordingly, I concur in the judgment affirming the Court of Appeals' decision.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with the outcome in this case, but for a reason more fundamental than the one relied upon by JUSTICE STEVENS. In my view it makes no difference whether or not

§ 1409(a) passes "heightened scrutiny" or any other test Members of the Court might choose to apply. The complaint must be dismissed because the Court has no power to provide the relief requested: conferral of citizenship on a basis other than that prescribed by Congress.

The Constitution "contemplates two sources of citizenship, and two only: birth and naturalization." *United States* v. *Wong Kim Ark*, 169 U. S. 649, 702 (1898). Under the Fourteenth Amendment, "[e]very person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." *Ibid.* Petitioner, having been born outside the territory of the United States, is an alien as far as the Constitution is concerned, and "can only become a citizen by being naturalized, either by treaty, as in the case of the annexation of foreign territory; or by authority of Congress." *Id.*, at 702–703; see also *Rogers* v. *Bellei*, 401 U. S. 815, 827 (1971). Here it is the "authority of Congress" that is appealed to— its power under Art. I, § 8, cl. 4, to "establish an uniform Rule of Naturalization." If there is no congressional enactment granting petitioner citizenship, she remains an alien.

The enactment on which petitioner relies is § 309 of the Immigration and Nationality Act (INA), 66 Stat. 238, as amended, 8 U. S. C. § 1409, which establishes the requirements for the acquisition of citizenship by a child born out of wedlock when the child's father is a United States citizen. Section 1409(a) provides, in relevant part, that § 1401(g), which confers citizenship on foreign-born children when one parent is an alien and the other a citizen of the United States, shall apply:

> "(a) . . . as of the date of birth to a person born out of wedlock if—
> "(1) a blood relationship between the person and the father is established by clear and convincing evidence,
> "(2) the father had the nationality of the United States at the time of the person's birth,

"(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

"(4) while the person is under the age of 18 years—

"(A) the person is legitimated under the law of the person's residence or domicile,

"(B) the father acknowledges paternity of the person in writing under oath, or

"(C) the paternity of the person is established by adjudication of a competent court."

By its plain language, § 1409(a) sets forth a precondition to the acquisition of citizenship under § 1401(g) by the illegitimate child of a citizen-father. Petitioner does not come into federal court claiming that she met that precondition, and that the State Department's conclusion to the contrary was factually in error. Rather, she acknowledges that she did not meet the last two requirements of that precondition, §§ 1409(a)(3) and (4). She nonetheless asks for a "declaratory judgment that [she] is a citizen of the United States" and an order to the Secretary of State requiring the State Department to grant her application for citizenship, App. 11–12, because the requirements she did not meet are not also imposed upon illegitimate children of citizen-mothers, and therefore violate the Equal Protection Clause.[1] Even if we

---

[1] Petitioner makes the equal protection claim on behalf of her father, not on her own behalf. JUSTICE BREYER finds that she has third-party standing to make the claim because "[s]he has a 'close' and relevant relationship" with her father, and "there was 'some hindrance' to her father's asserting his own rights." Post, at 473 (quoting from Powers v. Ohio, 499 U. S. 400, 411 (1991)). As an original matter, I would agree with JUSTICE O'CONNOR that this ground is inadequate, but I do not read our cases as demanding so significant an impairment of the rightholder's ability to sue as she does. For example, in Craig v. Boren, 429 U. S. 190, 197 (1976), although the rightholder who was one of the named plaintiffs had indeed lost his ability to sue because he had turned 21, there was "no barrier whatever" to assertion of the constitutional claim by other Oklahoma males between 18 and 20. Id., at 216 (Burger, C. J., dissenting). Certainly here, as in

were to agree that the difference in treatment between illegitimate children of citizen-fathers and citizen-mothers is unconstitutional, we could not, consistent with the limited judicial power in this area, remedy that constitutional infirmity by declaring petitioner to be a citizen or ordering the State Department to approve her application for citizenship. "Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship." *INS* v. *Pangilinan*, 486 U. S. 875, 884 (1988) (internal quotation marks and citation omitted).

Judicial power over immigration and naturalization is extremely limited. "Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977) (quoting *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206, 210 (1953)). See also *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982) ("[T]he power to admit or exclude aliens is a sovereign prerogative"); *Mathews* v. *Diaz*, 426 U. S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens"); *Kleindienst* v. *Mandel*, 408 U. S. 753, 769–770 (1972) ("[P]lenary congressional power to make policies and rules for exclusion of aliens has long been firmly established"); *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) ("That the formulation of [policies pertaining to the

*Craig*, petitioner is the "least awkward challenger," *id.*, at 197, since it is her right to citizenship that is at stake. Our law on this subject is in need of what may charitably be called clarification, but I would leave it for another day. Since I accept petitioner's third-party standing, there is no need for me to reach the Government's claim (which it asserts for the first time in its brief on the merits in this Court) that petitioner cannot invoke the Equal Protection Clause on her own behalf because she is not within the jurisdiction of the United States. Brief for Respondent 11–12.

entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government"). Because only Congress has the power to set the requirements for acquisition of citizenship by persons not born within the territory of the United States, federal courts cannot exercise that power under the guise of their remedial authority. "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [statutory] limitations." *Pangilinan, supra,* at 885. "An alien who seeks political rights as a member of this Nation can rightfully obtain them *only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications." United States* v. *Ginsberg,* 243 U. S. 472, 474 (1917) (emphasis added).

Petitioner argues, and JUSTICE BREYER's dissent seems to agree, see *post,* at 488–489, that because she meets the requirements of § 1401(g), the Court may declare her a citizen "at birth" under that provision and ignore § 1409(a) entirely, which allegedly unconstitutionally takes away that citizenship. Brief for Petitioner 14–15. This argument adopts a fanciful view of the statute, whereby § 1409(a) takes away what § 1401(g) has unconditionally conferred—as though § 1409(a) were some sort of a condition subsequent to the conveyance of real estate in a will. If anything, of course, it would be a condition *precedent,* since it says that § 1401(g) "shall apply as of the date of birth to a person born out of wedlock *if* " the person meets the requirements there set forth. 8 U. S. C. § 1409(a) (emphasis added). But a unitary statute is not to be picked apart in this fashion. To be sure, § 1401(g), read in isolation, might refer to both married and unmarried parents. We do not, however, read statutory provisions in isolation, as if other provisions in the same Act do not exist, see *King* v. *St. Vincent's Hospital,* 502 U. S. 215,

221 (1991). Section 1401(g) does *not* confer citizenship upon children born out of wedlock unless the requirements in § 1409 are satisfied.

It can be argued that in exempting an applicant from an unconstitutional requirement (either part or all of § 1409(a)) a court is not rewriting the law, but simply ignoring that portion of the law which is a nullity. See *post*, at 488–489 (BREYER, J., dissenting). That assumes, however, a judicial power to sever the unconstitutional portion from the remainder, and to apply the remainder unencumbered. Such a power exists in other cases—and is exercised on the basis of the Court's assessment as to whether Congress would have enacted the remainder of the law without the invalidated provision. See *New York* v. *United States*, 505 U. S. 144, 186 (1992). I know of no instance, however, in which this Court has severed an unconstitutional restriction upon the grant of immigration or citizenship. It is in my view incompatible with the plenary power of Congress over those fields for judges to speculate as to what Congress would have enacted if it had not enacted what it did—whether it would, for example, have preferred to extend the requirements of §§ 1409(a)(3) and (4) to mothers instead of eliminating them for fathers, or even to deny citizenship to illegitimate children entirely. ("[T]he Court has specifically recognized the power of Congress not to grant a United States citizen the right to transmit citizenship by descent." *Rogers*, 401 U. S., at 830.) Moreover, if the mere character of the naturalization power were not enough to render the severing of a limitation upon citizenship improper, the INA itself contains a clear statement of congressional intent: "A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter *and not otherwise.*" 8 U. S. C. § 1421(d) (emphasis added). JUSTICE BREYER's reliance upon the INA's general severability clause, 66 Stat. 281, § 406, is misplaced because the specific governs the general, see *Morales* v. *Trans World Airlines,*

*Inc.,* 504 U. S. 374, 384–385 (1992). The question of severance ultimately turns on "whether the provisions are inseparable by virtue of inherent character," *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 322 (1936), which must be gleaned from the structure and nature of the Act.

Another obstacle to judicial deletion of the challenged requirements is the fact that when a statutory violation of equal protection has occurred, it is not foreordained which particular statutory provision is invalid. The constitutional vice consists of unequal treatment, which may as logically be attributed to the disparately generous provision (here, supposedly, the provision governing citizenship of illegitimate children of citizen-mothers) as to the disparately parsimonious one (the provision governing citizenship of illegitimate children of citizen-fathers). "[W]e have noted that a court sustaining [an equal protection] claim faces 'two remedial alternatives: [It] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion.'" *Heckler* v. *Mathews,* 465 U. S. 728, 738 (1984), quoting *Welsh* v. *United States,* 398 U. S. 333, 361 (1970) (Harlan, J., concurring in result). Given the nature of the law at issue here, and given the clear command of 8 U. S. C. § 1421(d) ("under the conditions prescribed in this subchapter and not otherwise"), there is no doubt which of those alternatives the Court must employ. It cannot confer citizenship where Congress has not done so.

In any event, this is not like the ordinary equal protection case, in which one class is subjected to a restriction from which the other class is exempt. See, *e. g., Craig* v. *Boren,* 429 U. S. 190, 191–192 (1976) (men can be served alcoholic beverages only if over 21 years of age, whereas women need be only 18). Here *each* class is subjected to restrictions from which the other is exempt. While illegitimate children of citizen-fathers must meet the requirements of § 1409(a)

from which illegitimate children of citizen-mothers are exempt, illegitimate children of citizen-mothers must meet the quite different requirements of § 1409(c), from which illegitimate children of citizen-fathers are exempt.[2]  In this situation, eliminating the restrictions on fathers does not produce a law that complies with the Equal Protection Clause (assuming it is initially in violation), but rather produces a law that treats fathers *more* favorably than mothers.  There is no way a court can "fix" the law by merely disregarding one provision or the other as unconstitutional.  It would have to disregard them *both,* either leaving no restrictions whatever upon citizenship of illegitimate children or (what I think the more proper course) denying naturalization of illegitimate children entirely (since § 1401(g) was not meant to apply by its unqualified terms to illegitimate children).  Even outside the particularly sensitive area of immigration and naturalization, I am aware of no case that has engaged in such radical statutory surgery, and it certainly cannot be engaged in here.

In sum, this is not a case in which we have the power to remedy the alleged equal protection violation by either expanding or limiting the benefits conferred so as to deny or grant them equally to all.  "We are dealing here with an exercise of the Nation's sovereign power to admit or exclude foreigners in accordance with perceived national interests." *Fiallo,* 430 U. S., at 795, n. 6.  Federal judges may not decide what those national interests are, and what requirements for citizenship best serve them.

Because petitioner is not a citizen under any Act of Congress, we cannot give her the declaratory judgment or affirmative relief she requests.  I therefore concur in the judgment.

---

[2] Title 8 U. S. C. § 1409(c) provides that an illegitimate child born to a citizen-mother shall be a citizen "if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year."

460

JUSTICE GINSBURG, with whom JUSTICE SOUTER and JUSTICE BREYER join, dissenting.

As JUSTICE BREYER convincingly demonstrates, 8 U. S. C. § 1409 classifies unconstitutionally on the basis of gender in determining the capacity of a parent to qualify a child for citizenship. The section rests on familiar generalizations: mothers, as a rule, are responsible for a child born out of wedlock; fathers unmarried to the child's mother, ordinarily, are not. The law at issue might have made custody or support the relevant criterion. Instead, it treats mothers one way, fathers another, shaping Government policy to fit and reinforce the stereotype or historic pattern.

Characteristic of sex-based classifications, the stereotypes underlying this legislation may hold true for many, even most, individuals. But in prior decisions the Court has rejected official actions that classify unnecessarily and overbroadly by gender when more accurate and impartial functional lines can be drawn. While the Court is divided on Lorelyn Miller's standing to sue, a solid majority adheres to that vital understanding. As JUSTICE O'CONNOR's opinion makes plain, distinctions based on gender trigger heightened scrutiny and "[i]t is unlikely . . . that any gender classifications based on stereotypes can survive heightened scrutiny." *Ante*, at 452 (opinion concurring in judgment); *post*, at 482–488 (BREYER, J., dissenting).

On the surface, § 1409 treats females favorably. Indeed, it might be seen as a benign preference, an affirmative action of sorts. Compare *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 731, and n. 17 (1982), with *id.*, at 740–744 (Powell, J., dissenting). Two Justices today apparently take this view. JUSTICE STEVENS' opinion, in which THE CHIEF JUSTICE joins, portrays § 1409 as helpfully recognizing the different situations of unmarried mothers and fathers during the prenatal period and at birth, and fairly equalizing the "burdens" that each parent bears. See *ante*, at 433–434, 438. But pages of history place the provision in real-world

perspective. Section 1409 is one of the few provisions remaining in the United States Code that uses sex as a criterion in delineating citizens' rights. It is an innovation in this respect: During most of our Nation's past, laws on the transmission of citizenship from parent to child discriminated adversely against citizen mothers, not against citizen fathers.

## I

The first statute on the citizenship of children born abroad, enacted in 1790, stated: "[T]he children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: *Provided*, That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States." Act of Mar. 26, 1790, ch. 3, 1 Stat. 104. Statutes passed in 1795 and 1802 similarly conditioned the citizenship of the child born abroad on the father's at least one-time residence in the United States. Act of Jan. 29, 1795, § 3, 1 Stat. 415; Act of Apr. 14, 1802, § 4, 2 Stat. 155. This father's residence requirement suggests that Congress intended a child born abroad to gain citizenship only when the father was a citizen. That, indeed, was the law of England at the time. See 2 J. Kent, Commentaries on American Law *50–*51 (hereinafter Kent's Commentaries); 4 Geo. 2, ch. 21 (1731). The statutory language Congress adopted, however, was ambiguous. One could read the words "children of citizens" to mean that the child of a United States citizen mother and a foreign father would qualify for citizenship if the father had at some point resided in the country. See Binney, The Alienigenae of the United States, 2 Am. L. Reg. 193, 203–205 (1854). Or, as Chancellor Kent observed, the words might mean that both parents had to be United States citizens for citizenship to pass. 2 Kent's Commentaries *53.

Under the 1802 legislation, children born abroad could not become citizens unless their parents were citizens in 1802,

which meant that as the years passed few foreign-born persons could qualify. Daniel Webster, among others, proposed remedial legislation. His bill would have granted citizenship to children born abroad to United States-born citizen mothers as well as fathers. His effort was unsuccessful. See Cong. Globe, 30th Cong., 1st Sess., 827 (1848); F. Franklin, The Legislative History of Naturalization in the United States 271–276 (reprint ed. 1971). Instead, in 1855, Congress clarified that citizenship would pass to children born abroad only when the father was a United States citizen. Act of Feb. 10, 1855, §2, 10 Stat. 604. Codified as §1993 of the Revised Statutes, the provision originating in 1855 read: "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States." Rev. Stat. §1993.

In these early statutes, Congress did not differentiate between children born abroad to married parents and those born out of wedlock. Section 1993, as applied, allowed transmission of citizenship to children born out of wedlock if the father legitimated the child. See, e. g., 32 Op. Atty. Gen. 162, 164–165 (1920); see also *Guyer* v. *Smith*, 22 Md. 239 (1864) (foreign-born children who remain illegitimate do not qualify for citizenship). In several reported instances, children legitimated by their fathers gained citizenship even though the legitimation occurred, as it did in Lorelyn Miller's case, after the child reached majority. See *In re P*, 4 I. & N. Dec. 354 (C. O. 1951); 7 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 93.04[2][d], pp. 93–43 to 93–44 (1992) (hereinafter Gordon). But see 3 G. Hackworth, Digest of International Law 29 (1942) (noting a case in which legitimation postmajority was deemed sufficient, but maintaining that "[n]ormally the legitimation must take place during the minority of the child").

In the early part of this century, the State Department permitted the transmission of citizenship from unwed mother to child reasoning that, for the child born out of wedlock, the mother "stands in the place of the father." House Committee on Immigration and Naturalization, A Report Proposing A Revision and Codification of the Nationality Laws of the United States, Part One: Proposed Code with Explanatory Comments, 76th Cong., 1st Sess., 18 (Comm. Print 1939) (hereinafter Proposed Code). Ultimately, however, the Attorney General rejected the Department's reasoning, finding it incompatible with § 1993's exclusive reference to fathers. See 39 Op. Atty. Gen. 397, 398 (1939).

Women's inability to transmit their United States citizenship to children born abroad was one among many gender-based distinctions drawn in our immigration and nationality laws. The woman who married a foreign citizen risked losing her United States nationality. In early days, "marriage with an alien, whether a friend or an enemy, produce[d] no dissolution of the native allegiance of the wife." *Shanks* v. *Dupont*, 3 Pet. 242, 246 (1830) (Story, J.). By the end of the 19th century, however, a few courts adopted the view that a woman's nationality followed her husband's, see, *e. g.*, *Pequignot* v. *Detroit*, 16 F. 211, 216 (CC ED Mich. 1883), particularly when the woman resided abroad in her husband's country, see, *e. g.*, *Ruckgaber* v. *Moore*, 104 F. 947, 948–949 (CC ED NY 1900). See generally C. Bredbenner, A Nationality of Her Own: Women, Marriage, and the Law of Citizenship 58–59 (1998) (hereinafter Bredbenner); Sapiro, Women, Citizenship, and Nationality: Immigration and Naturalization Policies in the United States, 13 Politics & Soc. 1, 4–10 (1984). State Department officials inclined towards this view as well. See L. Gettys, The Law of Citizenship in the United States 118 (1934). In 1907, Congress settled the matter: It provided by statute that a female United States citizen automatically lost her citizenship upon marriage to an alien. Act of Mar. 2, 1907, § 3, 34 Stat. 1228. This Court upheld the statute, noting that "[t]he identity of husband and

wife is an ancient principle of our jurisprudence." *Macken-zie* v. *Hare*, 239 U. S. 299, 311 (1915).

The statutory rule that women relinquished their United States citizenship upon marriage to an alien encountered increasing opposition, fueled in large part by the women's suffrage movement and the enhanced importance of citizenship to women as they obtained the right to vote. See Bredbenner 64, 68–81; Sapiro, *supra*, at 12–13. In response, Congress provided a measure of relief. Under the 1922 Cable Act, marriage to an alien no longer stripped a woman of her citizenship automatically. Act of Sept. 22, 1922 (Cable Act), ch. 411, § 3, 42 Stat. 1022. But equal respect for a woman's nationality remained only partially realized. A woman still lost her United States citizenship if she married an alien ineligible for citizenship; she could not become a citizen by naturalization if her husband did not qualify for citizenship; she was presumed to have renounced her citizenship if she lived abroad in her husband's country for two years, or if she lived abroad elsewhere for five years. *Id.*, §§ 3, 5; see also Sapiro, *supra*, at 11–12. A woman who became a naturalized citizen was unable to transmit her citizenship to her children if her noncitizen husband remained alive and they were not separated. See *In re Citizenship Status of Minor Children*, 25 F. 2d 210 (NJ 1928) ("the status of the wife was dependent upon that of her husband, and therefore the children acquired their citizenship from the same source as had been theretofore existent under the common law"); see also Gettys, *supra*, at 56–57. No restrictions of like kind applied to male United States citizens.

Instead, Congress treated wives and children of male United States citizens or immigrants benevolently. The 1855 legislation automatically granted citizenship to women who married United States citizens. Act of Feb. 10, 1855, ch. 71, § 2, 10 Stat. 604; see also *Kelly* v. *Owen*, 7 Wall. 496, 498 (1869) (the 1855 Act "confers the privileges of citizenship upon women married to citizens of the United States" with-

out further action); Bredbenner 15. Under an 1804 statute, if a male alien died after completing the United States residence requirement but before actual naturalization, his widow and children would be "considered as citizens." Act of Mar. 26, 1804, §2, 2 Stat. 292, 293. That 1804 measure granted no corresponding dispensation to the husband and children of an alien woman. In addition, Congress provided statutory exemptions to entry requirements for the wives and children of men but not for the husbands and children of women. See, e. g., Act of Mar. 3, 1903, §37, 32 Stat. 1213, 1221 (wives and children entering the country to join permanent resident aliens and found to have contracted contagious diseases during transit shall not be deported if the diseases were easily curable or did not present a danger to others); S. Rep. No. 1515, 81st Cong., 2d Sess., 415–417 (1950) (wives exempt from literacy and quota requirements).

In 1934, Congress moved in a new direction. It terminated the discrimination against United States citizen mothers in regard to children born abroad. Specifically, Congress amended §1993 to read:

> "Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child." Act of May 24, 1934, §1, 48 Stat. 797.[1]

---

[1] A 1921 bill contained a similar provision allowing United States citizen women to transmit citizenship to their children born abroad. The bill provided: "A child born at any time without the United States, either parent being at the time of such birth a citizen of the United States, may, if not a citizen under section 1993 of the Revised Statutes, derive United States citizenship under this section." H. R. Rep. No. 15603, 66th Cong., 3d Sess., §33(2), p. 26 (1921). This 1921 bill, a precursor to the Cable

Senate and House Reports on the Act stated that the change was made "to establish complete equality between American men and women in the matter of citizenship for themselves and for their children." S. Rep. No. 865, 73d Cong., 2d Sess., 1 (1934); accord, H. R. Rep. No. 131, 73d Cong., 1st Sess., 2 (1933); see generally Orfield, The Citizenship Act of 1934, 2 U. Chi. L. Rev. 99, 100–106 (1935). Congress again did not speak of children born out of wedlock, but the 1934 Act "was construed as authorizing transmission of American citizenship by descent by an American citizen mother to a child born abroad . . . out of wedlock under the same conditions as a child born in wedlock." 7 Gordon § 93.04[2][b], at 93–42; see also id., § 93.04[2][d][iii], at 93–46.

The 1934 Act's equal respect for the citizenship stature of mothers and fathers of children born abroad did not remain unmodified. Six years later, Congress passed the Nationality Act of 1940, which replaced the Revised Statutes' single provision on citizenship of children born abroad with an array of provisions that turned on whether the child was born in an outlying possession of the United States, whether one or both of the child's parents were United States citizens, and whether the child was born in or out of wedlock. The 1940 Act preserved Congress' earlier recognition of parental equality in regard to children born in wedlock, but established a different regime for children born out of wedlock, one that disadvantaged United States citizen fathers and their children.

Under the 1940 Act, if the mother of the child born abroad out of wedlock held United States citizenship and previously had resided in the country or in a United States possession, the child gained the mother's nationality from birth, provided the child's paternity was not established by legitima-

---

Act, passed the House Committee on Immigration and Naturalization but proceeded no further. See H. R. Rep. No. 1185, 66th Cong., 3d Sess., 1 (1921).

tion or a court order.[2]   But if the father and not the mother held United States citizenship, then the child would qualify for United States citizenship only upon legitimation or adjudication of paternity during the child's minority.   Furthermore, the child generally had to live in the United States for five years before the age of 21.   The same residency requirement applied to children born abroad to married couples with only one United States citizen parent, whether that parent was the mother or the father.   Nationality Act of 1940, §§ 201, 205, 54 Stat. 1138–1140.[3]

Subsequent legislation retained the gender lines drawn in the 1940 Act.   The Immigration and Nationality Act of 1952 made only one significant change regarding the citizenship of children born abroad out of wedlock.   It removed the provision that a mother could pass on her nationality to her child only if the paternity of the child had not been established.[4]

---

[2] Nationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen.   8 U. S. C. § 1101(a)(22). The distinction has little practical impact today, however, for the only remaining noncitizen nationals are residents of American Samoa and Swains Island.   See T. Aleinikoff, D. Martin, & H. Motomura, Immigration: Process and Policy 974–975, n. 2 (3d ed. 1995).   The provision that a child born abroad out of wedlock to a United States citizen mother gains her nationality has been interpreted to mean that the child gains her citizenship as well; thus if the mother is not just a United States national but also a United States citizen, the child is a United States citizen.   See 7 Gordon § 93.04[2][b], at 93–42; id., § 93.04[2][d][viii], at 93–49.

[3] The provision granting citizenship to children born abroad out of wedlock applied retroactively; the provision granting citizenship to children born in wedlock did not.   The 1934 Act, too, was nonretroactive.   The net result was that a child born abroad out of wedlock to a United States citizen mother in 1933 or earlier had United States citizenship after the 1940 Act, but a child born in wedlock did not until 1994 when Congress enacted legislation making the 1934 Act retroactive.   Pub. L. 103–416, Tit. I, § 101(a)(2), 108 Stat. 4306, codified at 8 U. S. C. § 1401(h).

[4] The 1952 Act also provided that periods of service in the Armed Forces abroad could count toward satisfying the parental residency requirement in regard to a child born after January 13, 1941.   Immigration and Nation-

Immigration and Nationality Act, § 309, 66 Stat. 238–239. In 1986, however, Congress added further gender-based differentials. The Legislature that year permitted substitution of a written acknowledgment under oath or adjudication of paternity prior to age 18 in place of formal legitimation. To that extent, Congress eased access to citizenship by a child born abroad out of wedlock to a United States citizen father. At the same time, however, Congress imposed on such a child two further requirements: production of clear and convincing evidence of paternity, also a written statement from the father promising support until the child turned 18. The requirements for a child of a United States citizen mother remained the same; such a child obtained the mother's nationality if the mother had resided in the United States or its territorial possessions for at least a year before the child's birth. Act of Nov. 14, 1986, § 13, 100 Stat. 3657, codified as amended at 8 U. S. C. § 1409. No substantive change has been made since 1986 in the law governing citizenship of children born abroad out of wedlock.

## II

The history of the treatment of children born abroad to United States citizen parents counsels skeptical examination of the Government's prime explanation for the gender line drawn by § 1409—the close connection of mother to child, in contrast to the distant or fleeting father-child link. Or, as JUSTICE STEVENS puts it, a mother's presence at birth, identification on the birth certificate, and likely "initial custody" of the child give her an "opportunity to develop a caring relationship with the child," *ante*, at 444, which Congress legitimately could assume a father lacks. For most of our Nation's past, Congress demonstrated no high regard or respect for the mother-child affiliation. It bears emphasis, too, that in 1934, when Congress allowed United States citi-

---

ality Act of 1952, §§ 301(a)(7), 309(b), 66 Stat. 236, 238, codified as amended at 8 U. S. C. §§ 1401(g), 1409(b).

zen mothers to transmit their citizenship to their foreign-born children, Congress simultaneously and for the first time required that such children (unless both parents were citizens) fulfill a residence requirement: "[T]he right of citizenship shall not descend unless the child comes to the United States and resides therein for at least five years continuously immediately previous to his eighteenth birthday." Act of May 24, 1934, § 1, 48 Stat. 797. Commentary underscores what the text conveys. Congress largely relied on a residence requirement, not the sex of the child's citizen parent, to assure an abiding affiliation with the United States. See Proposed Code 10–11, 14.

Even if one accepts at face value the Government's current rationale, it is surely based on generalizations (stereotypes) about the way women (or men) are. These generalizations pervade the opinion of JUSTICE STEVENS, which constantly relates and relies on what "typically," or "normally," or "probably" happens "often." *E. g., ante,* at 436, 437, 442.

We have repeatedly cautioned, however, that when the Government controls "gates to opportunity," it "may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'" *United States* v. *Virginia,* 518 U. S. 515, 541 (1996) (quoting *Mississippi Univ. for Women* v. *Hogan,* 458 U. S., at 725); see also *Orr* v. *Orr,* 440 U. S. 268, 283 (1979) ("Where, as here, the State's . . . purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex."). Only an "'exceedingly persuasive justification,'" *Kirchberg* v. *Feenstra,* 450 U. S. 455, 461 (1981) (quoting *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 273 (1979)), one that does "not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females," *United States* v. *Virginia,* 518 U. S., at 533, will support dif-

ferential treatment of men and women. See *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 152 (1994) (KENNEDY, J., concurring in judgment) (noting that prevailing case law "reveal[s] a strong presumption that gender classifications are invalid").

One can demur to the Government's observation that more United States citizen mothers of children born abroad out of wedlock actually raise their children than do United States citizen fathers of such children. As JUSTICE BREYER has elucidated, this observation does not justify distinctions between male and female United States citizens who take responsibility, or avoid responsibility, for raising their children. Nor does it justify reliance on gender distinctions when the alleged purpose—assuring close ties to the United States—can be achieved without reference to gender. As Judge Wald commented in discussing an analogous claim when this case was before the Court of Appeals,

> "Congress is free to promote close family ties by ensuring that citizenship is conferred only on children who have at least minimal contact with citizen parents during their early and formative years. . . . But this putative interest provides absolutely no basis for requiring fathers, and only fathers, to formally declare parentage and agree to provide financial support before a child reaches age 18." *Miller* v. *Christopher*, 96 F. 3d 1467, 1476 (CADC 1996) (opinion concurring in judgment).

\*     \*     \*

In 1934, it was no doubt true that many female United States citizens who gave birth abroad had married foreigners and moved to their husbands' country, and that the children of such marriages were brought up as natives of a foreign land. And if a female United States citizen were married to a United States citizen, her children born abroad could obtain United States citizenship through their father. Thus, the historic restriction of citizenship to children born abroad

of United States citizen fathers may not have affected many women. But, in the words of one woman who testified in favor of the 1934 Act (and later became the first woman to sit as a federal district court judge), "[w]hether there are a lot of people who suffer or whether there are a few who suffer, it seems to us that the principle of equal application of the law to men and women ought to receive recognition." Hearings on H. R. 3673 and H. R. 77 before the House Committee on Immigration and Naturalization, 73d Cong., 1st Sess., 36 (1933) (testimony of Burnita Shelton Matthews). Congress recognized this equality principle in 1934, and is positioned to restore that impartiality before the century is out.

JUSTICE BREYER, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

Since the founding of our Nation, American statutory law, reflecting a long-established legal tradition, has provided for the transmission of American citizenship from parent to child—even when the child is born abroad. Today's case focuses upon statutes that make those children, when born out of wedlock, "citizens of the United States at birth." 8 U. S. C. §§ 1401 and 1409. The statutes, as applied where only one parent is American, require the American parent—whether father or mother—to prove the child is his or hers and to meet a residency requirement. The statutes go on to require (1) that the American parent promise to provide financial support for the child until the child is 18, and (2) that the American parent (or a court) legitimate or formally acknowledge the child before the child turns 18—*if and only if the American parent is the father,* but not if the parent is the mother.

What sense does it make to apply these latter two conditions only to fathers and not to mothers in today's world—where paternity can readily be proved and where women and men both are likely to earn a living in the workplace? As

JUSTICE O'CONNOR has observed, and as a majority of the Court agrees, "[i]t is unlikely . . . that any gender classifications based on stereotypes can survive heightened scrutiny." *Ante*, at 452. These two gender-based distinctions lack the " 'exceedingly persuasive' " support that the Constitution requires. *United States* v. *Virginia*, 518 U. S. 515, 530 (1996). Consequently, the statute that imposes them violates the Fifth Amendment's "equal protection" guarantee. See *Bolling* v. *Sharpe*, 347 U. S. 497, 500 (1954).

## I

The family whose rights are at issue here consists of Charlie Miller, an American citizen, Luz Peñero, a citizen of the Philippines, and their daughter, Lorelyn. Lorelyn was born out of wedlock in 1970 in the Philippines. The relevant citizenship statutes state that a child born out of wedlock shall be a "citize[n] of the United States at birth," § 1401, if the child is born to a father who "had the nationality of the United States at the time of the person's birth," if the "blood relationship between the person and the father is established by clear and convincing evidence," if the father had been physically present in the United States for five years, and:

> "(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and
> "(4) while the person is under the age of 18 years—
> "(A) the person is legitimated under the law of the person's residence or domicile,
> "(B) the father acknowledges paternity of the person in writing under oath, or
> "(C) the paternity of the person is established by adjudication of a competent court." 8 U. S. C. §§ 1409(a) and 1401(g).

Charlie Miller did not meet the requirements set forth in subsections (3) and (4) above on time. And the question be-

fore us is whether the Constitution forbids the application of those requirements for the reason that the statute imposed them only where the child's American parent is the child's father, not the mother. In my view the Constitution does forbid their application.

## II

I agree with JUSTICE STEVENS' resolution of the Government's three threshold claims. First, the Government takes issue with Lorelyn's argument that provisions (3) and (4) unconstitutionally infringe the rights of her father, Charlie, an American citizen. Brief for Respondent 11. It adds that Charlie, not Lorelyn, should assert those rights himself and that Lorelyn lacks legal "standing" to do so. *Id.*, at 11, and n. 2. This Court has made clear, however, that a party can "assert" the constitutional rights of another person, where (1) that party has "suffered an 'injury in fact'"; (2) the party and the other person have a "close relationship"; and (3) "there was some hindrance" to the other person's "asserting" his "own rights." *Campbell* v. *Louisiana, ante,* at 397; see also *Powers* v. *Ohio,* 499 U. S. 400, 411 (1991). And these three requirements are met here.

Lorelyn has suffered an "injury in fact." She has a "close" and relevant relationship with the other person, namely, her father. And there was "some hindrance" to her father's asserting his own rights. Charlie began this lawsuit (originally filed in Texas) as a party, raising his own equal protection claim. The Government originally moved to dismiss the complaint, contending that *Charlie* "should be dismissed from this suit because he lack[ed] standing." Motion to Dismiss Plaintiff's First Amended Complaint, or, in the Alternative, to Transfer Venue 6. The District Court agreed with the Government that Charlie lacked "standing," and he was dismissed from the suit. App. 11a. Lorelyn remained as the sole plaintiff, and for reasons of venue, see 28 U. S. C. § 1391(e)(1), the court then transferred the case to the District of Columbia pursuant to § 1406(a). App. 11a.

The conclusion that the Government "hindered" Charlie's assertion of his own rights in this case is irresistible.

The Government points out that Charlie might have appealed the adverse Texas District Court ruling. Brief for Respondent 11, n. 2. But appeals take time and money; the transfer of venue left the plaintiffs uncertain about where to appeal; the case was being heard with Lorelyn as plaintiff in any event; and the resulting comparison of costs and benefits (viewed prospectively) likely would have discouraged Charlie's pursuit of the alternative appeal route. The Government's successful dismissal motion thus had practical consequences that "hindered" Charlie at least as much as those we have elsewhere said create "hindrances" sufficient to satisfy this portion of the "third-party standing" test. See, e. g., Campbell, supra, at 398 (criminal defendant can assert rights of racially excluded petit jurors because of "arduous" process surrounding, and small benefits accruing to, juror effort to vindicate own rights); cf. Craig v. Boren, 429 U. S. 190, 193–194 (1976) ("decision . . . to forgo consideration of the constitutional merits . . . to await" another party's identical claim would "foster repetitive and time-consuming litigation under the guise of caution and prudence").

Second, the Government, citing United States v. Verdugo-Urquidez, 494 U. S. 259 (1990), and Johnson v. Eisentrager, 339 U. S. 763 (1950), argues that the Fifth Amendment does not protect an alien, such as Lorelyn, living outside the United States. Brief for Respondent 11–12. The rights to be vindicated here, however, are Charlie's, not Lorelyn's. And, in any event, those cases, as JUSTICE STEVENS points out, are irrelevant, for the matter at issue here is whether or not Lorelyn is a citizen. See Rogers v. Bellei, 401 U. S. 815 (1971) (considering on the merits a putative citizen's claim that he was a citizen due to the operation of the Fifth Amendment, even though he apparently was living outside the United States at the time he filed suit).

Third, the Government argues that Lorelyn cannot succeed because a federal court lacks the power to grant her the relief she seeks, namely, a grant of citizenship. Brief for Respondent 43–50. As I shall later explain in more detail, however, this argument is beside the point, for, once the two unconstitutional clauses are excised from the statute, that statute operates automatically to confer citizenship upon Lorelyn "at birth." 8 U. S. C. § 1401; see Part V, *infra*.

JUSTICE O'CONNOR, joined by JUSTICE KENNEDY, says that Lorelyn cannot assert her father's rights because "she has not demonstrated a substantial hindrance to her father's ability to assert his own rights." *Ante*, at 447. But the obstacles that the Government placed in her father's path substantially hindered his efforts to do so in practice. See *supra*, at 473–474. Several of the cases mentioned in JUSTICE O'CONNOR's opinion involved the denial of standing, but none of those cases involved any "hindrance," and JUSTICE O'CONNOR does not claim that they do. See *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 234 (1990) (husband lacks standing to assert wife's moot claim); *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 544–545 (1986) (school board member lacks standing to defend on board's behalf a claim that all other board members voted not to defend); *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 112, n. 25 (1979) (nonresidents lack standing to challenge local real estate practices as discriminatory); *Heald* v. *District of Columbia*, 259 U. S. 114, 123 (1922) (District resident lacks standing to claim local tax unconstitutional as applied to bonds held by nonresidents outside District). I have previously pointed to cases in which the Court has found third-party standing where the "hindrance" was of the same kind and approximate degree as that present here. *Supra*, at 474. There are, of course, other cases finding standing that arguably involve even greater hindrance. See, *e. g.*, *Hodel* v. *Irving*, 481 U. S. 704, 711–712 (1987); *Carey* v. *Population Services Int'l*, 431 U. S. 678, 684, n. 4 (1977); *Singleton* v.

*Wulff*, 428 U. S. 106, 108 (1976); *Craig, supra*, at 192; *Eisenstadt* v. *Baird*, 405 U. S. 438, 446 (1972); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 459 (1958); *Barrows* v. *Jackson*, 346 U. S. 249, 254 (1953). But they set no inner limit.

Nor do I agree with JUSTICE O'CONNOR's determination that "rational scrutiny" must apply to Lorelyn's assertion of her own rights. Lorelyn belongs to a class made up of children of citizen fathers, whom the law distinguishes from the class of children of citizen mothers, solely on grounds of the parent's gender. This Court, I assume, would use heightened scrutiny were it to review discriminatory laws based upon ancestry, say, laws that denied voting rights or educational opportunity based upon the religion, or the racial makeup, of a parent or grandparent. And, if that is so, I am not certain that it makes a significant difference whether one calls the rights at issue those of Lorelyn or of her father. *Allen* v. *Wright*, 468 U. S. 737 (1984), does not hold to the contrary. *Id.*, at 755 (black schoolchildren's parents who claimed a "stigmatizing injury" due to Internal Revenue Service decision to grant tax exempt status to racially discriminatory private schools had not been "personally denied equal treatment," and thus had not been injured).

Regardless, like JUSTICE O'CONNOR, I "do not share," and thus I believe a Court majority does not share, "JUSTICE STEVENS' assessment that the provision withstands heightened scrutiny." *Ante*, at 451. I also agree with JUSTICE O'CONNOR that "[i]t is unlikely" that "gender classifications based on stereotypes can survive heightened scrutiny," *ante*, at 452, a view shared by at least five Members of this Court. Indeed, for reasons to which I shall now turn, we must subject the provisions here at issue to "heightened scrutiny." And those provisions cannot survive.

III

This case is about American citizenship and its transmission from an American parent to his child. The right of citi-

zenship, as this Court has said, is "a most precious right." *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 159 (1963); see also *Fedorenko* v. *United States*, 449 U. S. 490, 507 (1981) (citizenship is a "priceless treasure" (internal quotation marks omitted)); *Luria* v. *United States*, 231 U. S. 9, 22 (1913) ("Citizenship is membership in a political society"); *Afroyim* v. *Rusk*, 387 U. S. 253, 268 (1967) ("[This Nation's] citizenry is the country and the country is its citizenry").

Further, the tie of parent to child is a special one, which in other circumstances by itself has warranted special constitutional protection. See, *e. g.*, *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); see also *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535 (1942).

Moreover, American statutory law has consistently recognized the rights of American parents to transmit their citizenship to their children. See Act of Mar. 26, 1790, § 1, 1 Stat. 103; Act of Jan. 29, 1795, § 3, 1 Stat. 415; Act of Apr. 14, 1802, § 4, 2 Stat. 155; Act of Feb. 10, 1855, § 1, 10 Stat. 604; Rev. Stat. § 1993; Act of Mar. 2, 1907, § 6, 34 Stat. 1229; Act of May 24, 1934, § 1, 48 Stat. 797; Nationality Act of 1940, § 201(g), 54 Stat. 1139; Immigration and Nationality Act of 1952, §§ 301(a)(7), (b), 66 Stat. 235, 236, as amended, 8 U. S. C. § 1401; cf., *e. g.*, 1 Oppenheim's International Law § 384 (R. Jennings & A. Watts 9th ed. 1992) (noting that in many States, children born abroad of nationals become nationals); 43 A. Berger, Encyclopedic Dictionary of Roman Law 389 (1953) (Roman citizenship was acquired principally by parentage); Sandifer, A Comparative Study of Laws Relating to Nationality at Birth and to Loss of Nationality, 29 Am. J. Int'l L. 248, 248–261, 278 (1935) (discussing citizenship laws throughout the world and noting the "widespread extent of the rule of *jus sanguinis*"); E. de Vattel, The Law of Nations 101–102 (J. Chitty transl. 1883) (1758).

Finally, the classification at issue is gender based, and we have held that, under the equal protection principle, such

classifications may not rest on generalizations about the different capacities of males and females when neutral categories would serve the legislature's end. *United States* v. *Virginia*, 518 U. S., at 540–546.

These circumstances mean that courts should not diminish the quality of review—that they should not apply specially lenient standards—when they review these statutes. The statutes focus upon two of the most serious of human relationships, that of parent to child and that of individual to the State. They tie each to the other, transforming both while strengthening the bonds of loyalty that connect family with Nation. Yet because they confer the status of citizenship "at birth," they do not involve the transfer of loyalties that underlies the naturalization of aliens, where precedent sets a more lenient standard of review. See *Fiallo* v. *Bell*, 430 U. S. 787 (1977).

To the contrary, the same standard of review must apply when a married American couple travel abroad or temporarily work abroad and have a child as when a single American parent has a child born abroad out of wedlock. If the standard that the law applies is specially lenient, then statutes conferring citizenship upon these children could discriminate virtually free of independent judicial review. And as a result, many such children, lacking citizenship, would be placed outside the domain of basic constitutional protections. Nothing in the Constitution requires so anomalous a result.

I recognize that, ever since the Civil War, the transmission of American citizenship from parent to child, *jus sanguinis*, has played a role secondary to that of the transmission of citizenship by birthplace, *jus soli*. See *Rogers* v. *Bellei*, 401 U. S., at 828; see also *Weedin* v. *Chin Bow*, 274 U. S. 657, 669–671 (1927) (citing *United States* v. *Wong Kim Ark*, 169 U. S. 649, 674 (1898), and *id.*, at 714 (Fuller, C. J., dissenting)). That lesser role reflects the fact that the Fourteenth Amendment's Citizenship Clause does not mention statutes that might confer citizenship "at birth" to children of Americans

born abroad. U. S. Const., Amdt. 14, § 1 (stating that "[a]ll persons born or naturalized in the United States . . . are citizens"). But that omission, though it may give Congress the power to decide whether or not to extend citizenship to children born outside the United States, see *Rogers* v. *Bellei, supra,* at 835, does not justify more lenient "equal protection" review of statutes that embody a congressional decision to do so.

Nothing in the language of the Citizenship Clause argues for less close scrutiny of those laws conferring citizenship at birth that Congress decides to enact. Nor have I found any support for a lesser standard in either the history of the Clause or its purpose. To the contrary, those who wrote the Citizenship Clause hoped thereby to assure that courts would not exclude newly freed slaves—born within the United States—from the protections the Fourteenth Amendment provided, including "equal protection of the laws." See, *e. g., Afroyim* v. *Rusk,* 387 U. S., at 262; *id.,* at 283–284 (Harlan, J., dissenting); H. Flack, Adoption of the Fourteenth Amendment 83–97 (1908). They took special care, lest deprivation of citizenship undermine the Amendment's guarantee of "equal protection of the laws." Care is no less necessary when statutes, transferring citizenship between American parent and child, make the child a citizen "at birth." How then could the Fourteenth Amendment itself provide support for a diminished standard of review?

Nor have I found any such support in the history of the *jus sanguinis* statutes. That history shows a virtually unbroken tradition of transmitting American citizenship from parent to child "at birth," under statutes that imposed certain residence requirements. *Supra,* at 477; see also *Bellei, supra,* at 835. A single gap occurred when, for a brief period of time, the relevant statutes (perhaps inadvertently) failed to confer citizenship upon what must have been a small group of children born abroad between 1802 and 1855 whose citizen fathers were also born between 1802 and 1855. See

*Montana* v. *Kennedy*, 366 U. S. 308, 311–312 (1961); *Weedin, supra,* at 663–664; *Wong Kim Ark, supra,* at 673–674. But even then, some courts, recognizing the importance of the right, found common-law authority for the transmission to those children of their parent's American citizenship. See *Ludlam* v. *Ludlam,* 26 N. Y. 356, 362–372 (1863); see also *Lynch* v. *Clarke,* 1 Sandf. Ch. 583, 659–663 (N. Y. 1844).

The history of these statutes does reveal considerable discrimination against women, particularly from 1855 to 1934. See *ante,* at 463–465 (GINSBURG, J., dissenting). But that discrimination then cannot justify this discrimination now, when much discrimination that the law once tolerated, including *"de jure* segregation and the total exclusion of women from juries," is "now unconstitutional even though [it] once coexisted with the Equal Protection Clause." *J. E. B.* v. *Alabama ex rel. T. B.,* 511 U. S. 127, 143, n. 15 (1994).

Neither have I found case law that could justify use here of a more lenient standard of review. JUSTICE STEVENS points out that this Court has said it will apply a more lenient standard in matters of " 'immigration and naturalization.' " *Ante,* at 435, n. 11 (quoting *Mathews* v. *Diaz,* 426 U. S. 67, 82 (1976)). But that language arises in a case involving aliens. The Court did not say it intended that phrase to include statutes that confer citizenship "at birth." And Congress does not believe that this kind of citizenship involves "naturalization." 8 U. S. C. § 1101(a)(23) ("The term 'naturalization' means the conferring of nationality of a state upon a person *after* birth, by any means whatsoever" (emphasis added)). The Court to my knowledge has never said, or held, or reasoned that statutes automatically conferring citizenship "at birth" upon the American child of American parents receive a more lenient standard of review.

The Court has applied a deferential standard of review in cases involving aliens, not in cases in which only citizens' rights were at issue. See *Mathews, supra* (rights of alien

residents); *Kleindienst* v. *Mandel,* 408 U. S. 753 (1972) (citizens' rights related to treatment of alien); *Fiallo* v. *Bell,* 430 U. S. 787 (1977) (citizens' rights to obtain immigration preferences for relatives who are aliens). When the Court has considered the latter kind of case, it has not lowered the standard of review. See *Bellei,* 401 U. S., at 828–836 (evaluating due process challenge to citizenship statute under generally applicable standard).

In sum, the statutes that automatically transfer American citizenship from parent to child "at birth" differ significantly from those that confer citizenship on those who originally owed loyalty to a different nation. To fail to recognize this difference, and consequently to apply an unusually lenient constitutional standard of review here, could deprive the children of millions of Americans, married and unmarried, working abroad, traveling, say, even temporarily to Canada or Mexico, of the most basic kind of constitutional protection. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 53 (1997) (Table 54) (reporting that, as of 1990, 1.86 million United States citizens were born abroad or at sea to American parents); see also Hearing before the Subcommittee on International Operations of the House Committee on Foreign Affairs, 102d Cong., 1st Sess., 114 (1991) (testimony of Andrew P. Sundberg) ("According to the most recent survey carried out by the State Department, 40,000 children are born abroad each year to a U. S. citizen parent"). Thus, generally prevailing, not specially lenient, standards of review must apply.

IV

If we apply undiluted equal protection standards, we must hold the two statutory provisions at issue unconstitutional. The statutes discriminate on the basis of gender, making it significantly more difficult for American fathers than for American mothers to transmit American citizenship to their children born out of wedlock. If the citizen parent is a man,

the statute requires (1) a promise by the father to support the child until the child is 18, and (2) before the child turns 18, legitimation, written acknowledgment by the father under oath, or an adjudication of paternity. 8 U. S. C. § 1409(a). If the citizen parent is a woman, she need not do either. § 1409(c).

Distinctions of this kind—based upon gender—are subject to a "'strong presumption'" of constitutional invalidity. *Virginia*, 518 U. S., at 532 (quoting *J. E. B., supra,* at 152 (KENNEDY, J., concurring in judgment)). The Equal Protection Clause permits them only if the Government meets the "demanding" burden of showing an "'exceedingly persuasive'" justification for the distinction. *Virginia, supra,* at 533; see also *J. E. B., supra,* at 136; *Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718, 724 (1982); *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 273 (1979); *Kirchberg* v. *Feenstra,* 450 U. S. 455, 461 (1981). That distinction must further important governmental objectives, and the discriminatory means employed must be "substantially related" to the achievement of those objectives. *Virginia, supra,* at 533 (citing *Mississippi Univ. for Women, supra,* at 724). This justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia,* 518 U. S., at 533. Further, "it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Ibid.;* see also *J. E. B., supra,* at 139–140, and n. 11; *Craig,* 429 U. S., at 201; *Califano* v. *Goldfarb,* 430 U. S. 199, 223–224 (1977) (STEVENS, J., concurring in judgment); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 643 (1975). The fact that the statutes "discriminat[e] against males rather than against females" is beside the point. *Mississippi Univ. for Women,* 458 U. S., at 723.

The statutory distinctions here violate these standards. They depend for their validity upon the generalization that mothers are significantly more likely than fathers to care for

their children, or to develop caring relationships with their children. But consider how the statutes work once one abandons that generalization as the illegitimate basis for legislative line-drawing we have held it to be. *Id.*, at 726, 730. First, assume that the American citizen is also the Caretaker Parent. The statute would then require a Male Caretaker Parent to acknowledge his child prior to the child's 18th birthday (or for the parent or child to obtain a court equivalent) and to provide financial support. It would not require a Female Caretaker Parent to do either. The gender-based distinction that would impose added burdens only upon the Male Caretaker Parent would serve no purpose at all. Second, assume that the American citizen is the Non-Caretaker Parent. In that circumstance, the statute would forgive a Female Non-Caretaker Parent from complying with the requirements (for formal acknowledgment and written promises to provide financial support) that it would impose upon a Male Non-Caretaker Parent. Again, the gender-based distinction that would impose lesser burdens only upon the Female Non-Caretaker Parent would serve no purpose.

To illustrate the point, compare the family before us—Charlie, Lorelyn, and Luz—with an imagined family—Carlos, a Philippine citizen, Lucy, his daughter, and Lenora, Lucy's mother and an American citizen. Suppose that Lenora, Lucy's unmarried mother, returned to the United States soon after Lucy's birth, leaving Carlos to raise his daughter. Why, under those circumstances, should Lenora not be required to fulfill the same statutory requirements that here apply to Charlie? Alternatively, imagine that Charlie had taken his daughter Lorelyn back to the United States to raise. The statute would not make Lorelyn an American from birth unless Charlie satisfied its two conditions. But had our imaginary family mother, Lenora, taken her child Lucy back to the United States, the statute would have automatically made her an American from birth with-

out anyone having satisfied the two conditions. The example suggests how arbitrary the statute's gender-based distinction is once one abandons the generalization that mothers, not fathers, will act as caretaker parents.

Let me now deal more specifically with the justifications that JUSTICE STEVENS finds adequate. JUSTICE STEVENS asserts that subsection (a)(4) serves two interests: first, "ensuring reliable proof of a biological relationship between the potential citizen and its citizen parent," *ante*, at 436, and second, "encouraging" certain relationships or ties, namely, "the development of a healthy relationship between the citizen parent and the child while the child is a minor," *ante*, at 438, as well as "the related interest in fostering ties between the foreign-born child and the United States," *ibid.* I have no doubt that these interests are important. But the relationship between the statutory requirements and those particular objectives is one of total misfit.

Subsection (a)(4) requires, for example, the American citizen father to "acknowledg[e]" paternity before the child reaches 18 years of age, or for the child or parent to obtain a court equivalent (legitimation or adjudication of paternity). JUSTICE STEVENS suggests that this requirement "produces the rough equivalent of the documentation," such as a birth certificate memorialized in hospital records, "already available to evidence the blood relationship between the mother and the child." *Ante*, at 436. But, even if I assume the "equivalency" (only for argument's sake, since birth certificates do not invariably carry a mother's true name or omit the father's), I still do not understand the need for the prior-to-18 legitimation-or-acknowledgment requirement. When the statute was written, one might have seen the requirement as offering some protection against false paternity claims. But that added protection is unnecessary in light of inexpensive DNA testing that will prove paternity with certainty. See Shapiro, Reifler, and Psome, The DNA Paternity Test: Legislating the Future Paternity Action, 7 J.

Law & Health 1, 29 (1992–1993) (current testing methods can determine probability of paternity to 99.999999% accuracy); see also H. R. Rep. No. 98–527, p. 38 (1983).

Moreover, a different provision of the statute, subsection (a)(1), already requires proof of paternity by "clear and convincing evidence." No one contests the validity of that provision, and I believe that biological differences between men and women would justify its imposition where paternity is at issue. In light of that provision, subsection (a)(4)'s protection against false claims is not needed. Indeed, the Government concedes that, in light of the "clear and convincing evidence" requirement, the "time limit for meeting the legitimation-or-acknowledgement requirement of Section 309(a)(4) must . . . reflect, at least in part, some *other* congressional concern." Brief for Respondent 27 (emphasis added).

JUSTICE STEVENS says that this "other concern" is a concern for the establishment of relationships and ties, to the father and to the United States, all before the child is 18. *Ante,* at 438. According to JUSTICE STEVENS, the way in which the requirement serves this purpose is by making certain the father knows of the child's existence—in the same way, it says, that a mother, by giving birth, automatically knows that the child exists. *Ibid.*

The distance between this knowledge and the claimed objectives, however, is far too great to satisfy any legal requirement of tailoring or proportionality. And the assumption that this knowledge of birth could make a significant gender-related difference rests upon a host of unproved gender-related hypotheses. Simple knowledge of a child's existence may, or may not, be followed by the kinds of relationships for which JUSTICE STEVENS hopes. A mother or a father, knowing of a child's birth, may nonetheless fail to care for the child or even to acknowledge the child. A father with strong ties to the child may, simply by lack of knowledge, fail to comply with the statute's formal require-

ments. A father with weak ties might readily comply. Moreover, the statute does little to assure any tie for, as JUSTICE STEVENS acknowledges, a child might obtain an adjudication of paternity "absent any affirmative act by the father, and perhaps even over his express objection." *Ante,* at 434.

To make plausible the connection between the statute's requirement and the asserted "relationship" goals, JUSTICE STEVENS must find a factual scenario where a father's knowledge—equivalent to the mother's knowledge that she has given birth—could lead to the establishment of a more meaningful parenting relationship or tie to America. He therefore points to what one might term the "war baby" problem—the problem created by American servicemen fathering children overseas and returning to America unaware of the related pregnancy or birth. The statutory remedy before us, however, is disproportionately broad even when considered in relation to that problem. JUSTICE STEVENS refers to 683,000 service personnel stationed in the Far East in 1970 when Lorelyn was born. *Ante,* at 439. The statute applies, however, to all Americans who live or travel abroad, including the 3.2 million private citizens, and the 925,000 Federal Government employees, who live, or who are stationed, abroad—of whom today only 240,000 are active duty military employees, many of whom are women. U. S. Dept. of State, Private American Citizens Residing Abroad (Nov. 21, 1997); U. S. Dept. of Commerce, Bureau of the Census, Americans Overseas in U. S. Censuses, Technical Paper 62, p. 62 (Nov. 1993) (1990 census figures); U. S. Dept. of Defense, Selected Manpower Statistics 23, 44 (DIOR/MO1–96 1996). Nor does the statute seem to have been aimed at the "war baby" problem, for the precursor to the provisions at issue was first proposed in a 1938 report and was first adopted in the Nationality Act of 1940, which was enacted *before* the United States entered World War II. Nationality Laws of the United States: Message from the President of the United

States, 76th Cong., 1st Sess., pt. 1, pp. 17–18 (Comm. Print submitted to House Comm. on Immigration and Naturalization, 1939); Nationality Act of 1940, § 205, 54 Stat. 1139.

Nor is there need for the gender-based discrimination at issue here, for, were Congress truly interested in achieving the goals JUSTICE STEVENS posits in the way JUSTICE STEVENS suggests, it could simply substitute a requirement of knowledge of birth for the present subsection (a)(4); or it could distinguish between Caretaker and Noncaretaker Parents, rather than between men and women. A statute that does not do so, but instead relies upon gender-based distinctions, appears rational only, as I have said, *supra*, at 482–484, if one accepts the legitimacy of gender-based generalizations that, for example, would equate gender and caretaking—generalizations of a kind that this Court has previously found constitutionally impermissible. See, *e. g., Virginia*, 518 U. S., at 542, 546 (striking down men-only admissions policy at Virginia Military Institute even assuming that "most women would not choose VMI's adversative method"); *J. E. B.*, 511 U. S., at 139, n. 11 (invalidating gender-based peremptory challenges "[e]ven if a measure of truth can be found in some of the gender stereotypes used to justify" them); *Craig*, 429 U. S., at 201 (invalidating Oklahoma law that established different drinking ages for men and women, although the evidence supporting the age differential was "not trivial in a statistical sense"); *Wiesenfeld*, 420 U. S., at 645 (holding unconstitutional statutory classification giving to widowed mothers benefits not available to widowed fathers even though "the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support"). Although JUSTICE STEVENS cites *Lehr* v. *Robertson*, 463 U. S. 248 (1983), for support, *ante*, at 441, that case was decided before the DNA advances described earlier.

For similar reasons, subsection (3) denies Charlie Miller "equal protection" of the laws. That subsection requires an

American father to "agre[e] . . . to provide financial support" for the child until the child "reaches the age of 18," but does not require the same of an American mother. I agree with the Government that this provision has as one objective helping to assure ties between father and child. Brief for Respondent 26. But I do not see why the same need does not exist with respect to a mother. And, where the American parent is the Non-Caretaker Parent, the need for such assurances would seem the same in respect to either sex. Where the American parent is the Caretaker Parent, there would seem no need for the assurance regardless of gender. Since either men or women may be caretakers, and since either men or women may be "breadwinners," one could justify the gender distinction only on the ground that more women are caretakers than men, and more men are "breadwinners" than women. This, again, is the kind of generalization that we have rejected as justifying a gender-based distinction in other cases. *Virginia, supra,* at 540–546; *J. E. B., supra,* at 139, n. 11; *Craig, supra,* at 201; *Wiesenfeld, supra,* at 645.

For these reasons, I can find no "exceedingly persuasive" justification for the gender-based distinctions that the statute draws.

## V

JUSTICE SCALIA argues that, if the provisions at issue violate the Constitution, we nonetheless are powerless to find a remedy. But that is not so. The remedy is simply that of striking from the statute the two subsections that offend the Constitution's equal protection requirement, namely, subsections (a)(3) and (a)(4). With those subsections omitted, the statute says that the daughter, Lorelyn, of one who, like Charlie, has proved paternity by "clear and convincing evidence," is an American citizen, and has lived in the United States for five years, is a "citize[n] of the United States at birth." 8 U. S. C. §§ 1409(a) and 1401. Whatever limitations there may be upon the Court's powers to grant citizen-

ship, those limitations are not applicable here, for the Court need not grant citizenship. The statute itself grants citizenship automatically, and "at birth." And this Court need only declare that that is so. *INS* v. *Pangilinan*, 486 U. S. 875 (1988), which JUSTICE SCALIA cites in support, is beside the point, for the plaintiffs in that case, conceding that the statute at issue did not make them citizens, asked the courts to confer citizenship as a remedy in equity. Cf. *Bellei*, 401 U. S., at 828–836 (assessing claim that statute conferred citizenship in the absence of a provision argued to be unconstitutional, without identifying any special remedial problems).

Of course, we can excise the two provisions only if Congress likely would prefer their excision, rather than imposing similar requirements upon mothers. *Califano* v. *Westcott*, 443 U. S. 76, 89–93 (1979); *Welsh* v. *United States*, 398 U. S. 333, 361 (1970) (Harlan, J., concurring in result). But, since the provisions at issue seem designed in significant part to address difficulties in proving paternity (along with providing encouragement for fathers to legitimate the child) and, since DNA advances have overcome the paternity-proof difficulties, I believe that Congress would have preferred severance.

JUSTICE SCALIA is also wrong, I believe, when he says that "the INA itself contains a clear statement of congressional intent" not to sever, *ante*, at 457, for the Act in fact contains the following explicit severability provision:

> "If any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby." §406, 66 Stat. 281; see note following 8 U. S. C. §1101, p. 38, "Separability."

The provision cited by JUSTICE SCALIA says:

> "A person may be naturalized as a citizen of the United States in the manner and under the conditions

prescribed in this title and not otherwise." § 310(d), 66 Stat. 239, 8 U. S. C. § 1421(d).

As "naturalization" under this statute does not include the conferral of citizenship at birth, the provision does not apply here. See 8 U. S. C. § 1101(a)(23) ("The term 'naturalization' means the conferring of nationality of a state upon a person *after* birth" (emphasis added)).

JUSTICE SCALIA also says that the law, as excised, would favor fathers over mothers. *Ante,* at 459. The law, however, would require both fathers and mothers to prove their parentage; it would require that one or the other be an American, it would impose residency requirements that, if anything, would disfavor fathers. I cannot find the reverse favoritism that JUSTICE SCALIA fears.

For these reasons, I would reverse the judgment of the Court of Appeals.