No. 98–1478. RAINEY *v.* CHEVER. Sup. Ct. Ga. Certiorari denied.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The rising incidence of out-of-wedlock births and delinquent fathers has had dire social consequences, including, in one expert's view: "lower newborn health and increased risk of early infant death; retarded cognitive and verbal development; lowered educational achievement; lowered levels of job attainment; increased behavioral problems; lowered ability to control impulses; warped social development; increased dependence on welfare; increased exposure to crime; and increased risk of being physically or sexually abused." App. to Pet. for Cert. 11 (affidavit of Patrick F. Fagan, former Deputy Assistant Secretary for Family and Social Services Policy, U. S. Dept. of Health and Human Services). The State of Georgia sought to address a particularly disturbing manifestation of this alarming trend. The General Assembly had learned of situations "in which a father of a child, born out of wedlock had failed to form a substantial parental relationship with a child, failed to provide support for the child, or both, and then came forward seeking to profit from the death of the child." *Id.,* at 19–20 (affidavit of State Rep. William C. Randall). Georgia amended its inheritance laws to provide that, in cases where a father's paternity has been established, "neither the father nor any child of the father nor any other paternal kin shall inherit from or through a child born out of wedlock if it shall be established by a preponderance of evidence that the father failed or refused openly to treat the child as his own or failed or refused to provide support for the child." Ga. Code Ann. § 53–2–4(b)(2) (1997).

The facts of this case poignantly illustrate the problem that Georgia sought to address. In 1997, DeAndre Bernard Hamilton died tragically in an automobile crash allegedly caused by a manufacturing defect. Before DeAndre's death, respondent, his biological father, showed little interest in his son. He had no role

in his son's life and had taken no responsibility for his upbringing. According to the petition, respondent had no contact with his son even though he lived less than one mile away from him. Indeed, respondent only met his son at the age of 15 when DeAndre (along with other children whom respondent apparently had fathered) confronted him. Respondent never legitimated DeAndre and never initiated a visit with him. He had no idea when (or if) DeAndre graduated from high school, or, until his death, where DeAndre attended college. Nevertheless, immediately after DeAndre died, respondent was the first person—of all the parents whose children were injured or killed—to file a suit seeking monetary damages for his death.

Petitioner, DeAndre's mother, who reared him for 20 years under these adverse conditions, filed a petition to determine the rights of heirs. See § 53-2-20. She contended that because respondent completely neglected DeAndre he was not entitled to any inheritance under § 53-2-4(b)(2). Respondent argued that § 53-2-4(b)(2) violated, *inter alia*, the Equal Protection Clauses of the United States and Georgia Constitutions. A Georgia Superior Court judge agreed and granted summary judgment to respondent. The Supreme Court of Georgia affirmed, ruling that § 53-2-4(b)(2) on its face violated the Equal Protection Clauses of the United States and Georgia Constitutions. 270 Ga. 519, 510 S. E. 2d 823 (1999). The court reasoned that the statute created "a gender-based classification" because it imposed the support obligation only on fathers of children born out of wedlock; by contrast, mothers of these children bore no such support obligations as a condition of inheritance. Appearing to apply intermediate scrutiny, it stated that "[a] statute containing a gender-based classification violates equal protection unless the classification furthers important governmental objectives, and the discriminatory means employed are 'substantially related' to the achievement of those governmental objectives." *Id.*, at 520; 510 S. E. 2d, at 824 (citing *Reed* v. *Reed*, 404 U. S. 71, 76 (1971); *Franklin* v. *Hill*, 264 Ga. 302; 444 S. E. 2d 778 (1994)). Although the court recognized that encouraging fathers to take responsibility for out-of-wedlock children was an "important interest," it appeared to conclude that Georgia had an equal interest in encouraging such behavior in mothers and, thus, § 53-2-4(b)(2) did not adequately advance this important interest. 270 Ga., at 520, 510 S. E. 2d, at 824. The court found the State's

1046

argument that mothers are less likely than fathers to abandon children born out of wedlock to be based on impermissible stereotypes and overbroad generalizations.

This decision arguably is inconsistent with this Court's prior decisions and, at a minimum, resolves an important question warranting this Court's review. Contrary to the Georgia Supreme Court's conclusion, § 53-2-4(b)(2) does not necessarily draw a gender-based classification but arguably distinguishes between two different categories of men: fathers who support their children born out of wedlock and fathers who do not. Although our prior decisions addressing Equal Protection Clause challenges to similar statutes are not entirely clear, they appear to indicate that heightened scrutiny does not apply. In *Quilloin* v. *Walcott*, 434 U. S. 246 (1978), we considered a Georgia law requiring both parents' consent to the adoption of children born in wedlock but only the mother's consent for children born out of wedlock (unless the father legitimated the child). We held that the law did not violate the Equal Protection Clause, noting that the State *"[u]nder any standard of review"* could take into consideration that a delinquent father, unlike a married (or even divorced) one, had "never exercised actual or legal custody over his child, and thus ha[d] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." *Id.*, at 256 (emphasis added). Subsequently, in *Parham* v. *Hughes*, 441 U. S. 347 (1979), we rejected a challenge to a Georgia law that provided that fathers (but not mothers) of out-of-wedlock children could not inherit from their children unless they had legitimated them. Four Justices took the view that the statute did not invidiously discriminate on the basis of sex and, therefore, evaluated the statute under rational-basis review. Justifying its application of the rational-basis test, that four-Justice plurality concluded that "the statutory classification does not discriminate against fathers as a class *but instead distinguishes between fathers who have legitimated their children and those who have not."* *Id.*, at 356 (emphasis added). Justice Powell, concurring in the judgment, believed that the statute should be reviewed under intermediate scrutiny and, applying that standard, agreed with the plurality that the statute passed constitutional muster. *Id.*, at 359-361. Finally, in *Lehr* v. *Robertson*, 463 U. S. 248 (1983), this Court upheld a New York law entitling all mothers of illegitimate children to prior notice of any adoption proceeding but entitling only

certain fathers to such notice. In holding that the statute did not invidiously discriminate between the father and mother in that case, we observed that the State could take account of the fact that the father had "never established any custodial, personal, or financial relationship with [his daughter]." *Id.*, at 267. Viewed against these decisions, the lower court's choice of heightened scrutiny, particularly in this case, appears to be in error.

Even if the Georgia Supreme Court correctly chose heightened scrutiny, its application of that standard is equally dubious. The only authority cited by the Georgia Supreme Court for its apparent conclusion that § 53–2–4(b)(2) was not substantially related to important governmental interests was a page from this Court's decision in *Miller* v. *Albright,* 523 U. S. 420, 442 (1998). This reliance on *Miller* is misplaced for several reasons. Most notably, the cited page does not even represent a holding of the Court but merely the views of two Justices. *Ibid.* (opinion of STEVENS, J., joined by REHNQUIST, C. J.). There was no opinion for the Court in *Miller;* rather six Justices, in three different opinions, affirmed a lower court judgment rejecting a constitutional challenge to a federal statute that imposed certain proof-of-paternity requirements on children born abroad to alien mothers and citizen fathers (but not alien fathers and citizen mothers). See *id.*, at 423–445; *id.*, at 445–452 (O'CONNOR, J., joined by KENNEDY, J., concurring in judgment); *id.*, at 452–459 (SCALIA, J., joined by THOMAS, J., concurring in judgment). Moreover, the principal opinion cited by the Georgia Supreme Court actually concluded that the statute at issue was *not* based on impermissible stereotypes, *id.*, at 442–445, reasoning that "[t]he biological differences between single men and single women provide a relevant basis for differing rules governing their ability to confer citizenship on children born in foreign lands," *id.*, at 445. Thus, while the fractured decision in *Miller* may demonstrate the need for additional guidance as to the constitutionality of laws differentiating between fathers and mothers of out-of-wedlock children, it does not stand for the proposition that all generalizations based on gender are constitutionally infirm.

Further, I am at a loss to understand how the Georgia Supreme Court's decision can be squared with this Court's decisions recognizing women's unique role in childbirth. For example, this Court invalidated a requirement that a woman seek her husband's consent before obtaining an abortion, reasoning that "[i]nasmuch

as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor." *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 71 (1976); see also *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 896 (1992) ("It is an inescapable biological fact that state regulation with respect to the child a woman is carrying will have a far greater impact on the mother's liberty than on the father's"). The logic of the abortion cases, suggesting that the State *may not* ignore a mother's unique efforts in carrying a child to term, flatly contradicts the Georgia Supreme Court's reasoning that the State *must* ignore these efforts when deciding whether she, as opposed to the father, is entitled to inherit from the deceased child's estate.

Apart from the apparent inconsistency between the decision below and this Court's decisions, several prudential considerations counsel in favor of granting certiorari. This Court routinely reviews state courts' decisions invalidating state or local laws on federal constitutional grounds. See, *e. g., Chicago* v. *Morales, ante,* p. 41; *Central State Univ.* v. *American Assn. of Univ. Professors, Central State Univ. Chapter,* 526 U. S. 124 (1999) *(per curiam).* Moreover, the State of Georgia has filed an *amicus* brief urging the Court to uphold the constitutionality of § 53–2–4(b)(2), and its views should affect our decision whether to exercise jurisdiction. Finally, the importance of the issue cannot be gainsaid. A variety of States have adopted similar legislation requiring fathers (but not mothers) to support their children born out of wedlock as a condition of inheriting from their estates. See, *e. g.,* Ala. Code § 43–8–48(2) (1991); Del. Code Ann., Tit. 12, § 508(2) (1995); Idaho Code § 15–2–109(b) (1979); Ky. Rev. Stat. Ann. § 391.105(c)(2) (Michie Supp. 1998); Me. Rev. Stat. Ann., Tit. 18–A, § 2–109(2)(iii) (1998); Miss. Code Ann. § 91–1–15(3)(d)(i) (1994); Mo. Rev. Stat. § 474.060.2 (1994); Neb. Rev. Stat. § 30–2309(2) (1995); S. C. Code Ann. § 62–2–109(2) (Supp. 1998); Tenn. Code Ann. § 31–2–105(a)(2)(B) (Supp. 1998); Va. Code Ann. § 64.1–5.1.3 (Supp. 1998). The decision of the Supreme Court of Georgia, resting on federal constitutional grounds, calls the continued validity of these statutes into doubt. In light of the issue's importance and the substantial tension between the decision below and this Court's decisions, I would vote to grant certiorari.