# IN THE COURT OF APPEALS OF IOWA

No. 19-0689
Filed November 30, 2020

**EQUITY ADVISORS, INC.,**
　　Plaintiff-Appellant,

**vs.**

**ZYLSTRA HARLEY-DAVIDSON OF ILLINOIS, INC.; ZYLSTRA, LLC; and ZYLSTRA CYCLE CO., INC.,**
　　Defendants-Appellees.
_____

　　Appeal from the Iowa District Court for Osceola County, Don E. Courtney, Judge.

　　Equity Advisors, Inc. appeals a summary judgment ruling in favor of Zylstra Harley-Davidson of Illinois, Inc.; Zylstra LLC, and Zylstra Cycle Company, Inc. **REVERSED AND REMANDED.**

　　Steven R. Postolka and Stephen F. Avery of Cornwall, Avery, Bjornstad & Scott, Spencer, for appellant.

　　Jeff W. Wright and Jessica A. Uhlenkamp of Heidman Law Firm, P.L.L.C., Sioux City, for appellees.

　　Considered by Tabor, P.J., and May and Greer, JJ.

**MAY, Judge.**

Equity Advisors, Inc. (Equity) appeals a summary judgment ruling in favor of Zylstra Harley-Davidson of Illinois, Inc.; Zylstra, LLC; and Zylstra Cycle Company, Inc. (collectively "Zylstra"). Equity claims the district court misapplied Illinois law when it concluded Equity's alleged contract with Zylstra was unenforceable. We reverse and remand for further proceedings.

**I. Background Facts and Prior Proceedings**

Zylstra owned and operated a Harley-Davidson dealership in St. Charles, Illinois. Equity is a licensed Illinois business broker. In 2010, Zylstra hired Equity to negotiate the sale of the dealership. Equity did so. The sale of the dealership closed in 2011. As part of the consideration for the sale, the buyer provided Zylstra with two promissory notes, one for $500,000 and another for $1,000,000.

According to Zylstra, though, the buyer stopped making payments in August 2015. So Zylstra sought to accelerate the notes. The buyer initially offered $975,000 to pay off roughly $1.3 million in outstanding debt. So Zylstra and Equity discussed an arrangement through which Equity would help negotiate a higher payoff amount. Among other things, Zylstra and Equity discussed the "success fee" Equity could receive for its help in resolving the matter. But they never signed a written agreement. Even so, Equity began negotiating on behalf of Zylstra.

But then Zylstra informed Equity it had retained an attorney to negotiate on its behalf. And Zylstra directed Equity to stop negotiating. Ultimately, Zylstra's attorney successfully negotiated an accelerated payoff of the notes.

Then Zylstra refused to pay Equity for its negotiating services. In response, Equity brought this action against Zylstra.

Zylstra filed a motion for summary judgment. Zylstra claimed the Illinois Business Brokers Act required any contract between Zylstra and Equity to be "in writing and signed." And there had been no signed agreement concerning Equity's 2015 services. So, Zylstra contended, Equity could recover no payment.

Equity resisted. Although Equity agreed that Illinois law applied, Equity contended the Illinois Business Brokers Act did not apply to its 2015 services because *those* services did not involve the sale of a business. Instead, Equity argued, it was only negotiating an early payoff of promissory notes.

The district court accepted the parties' agreement that Illinois law applied. And the court agreed with Zylstra that the Illinois Business Brokers Act applied to the parties' 2015 dealings. The court also agreed with Zylstra that, because there was no written and signed instrument, Equity could not prove an enforceable contract. So the court granted Zylstra's motion for summary judgment.

Equity now appeals.

**II. Scope and Standard of Review**

"We review a district court's summary judgment ruling 'for correction of errors at law.'" *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 36 (Iowa 2018) (quoting *Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 199 (Iowa 2007)). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3).

"We review the evidence in the light most favorable to the nonmoving party." *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). But "[a] party resisting a motion for summary judgment cannot rely on the mere assertions

in [its] pleadings but must come forward with evidence to demonstrate that a genuine issue of fact is presented." *Id.*

## III. Discussion

Equity contends the district court erred in concluding the Illinois Business Brokers Act (the Act) required summary judgment in Zylstra's favor. *See* 815 Ill. Comp. Stat. 307/10-1 (2016). So our review centers on the Act. It provides, in relevant part: "To be enforceable, every contract *for the services of a business broker* shall be in writing and signed by all contracting parties." 815 Ill. Comp. Stat. 307/10-35 (emphasis added); *see also Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 750 (Ill. App. Ct. 2013) ("A contract for business brokerage services must be in writing and signed by the parties.").

Here, there was no signed contract between the parties. So we must determine whether Equity's alleged contract with Zylstra was a "contract for the services of a business broker." *See* 815 Ill. Comp. Stat. 307/10-35. If so, it was not enforceable.

The Act defines a "business broker" as

any person who is required to register under Section 10-10 of this Act and, in return for a fee, commission, or other compensation:
    (1) promises to procure a business for any person or assists any person in procuring a business from any third person;
    (2) negotiates, offers, attempts or agrees to negotiate the sale, exchange, or purchase of a business;
    (3) buys, sells, offers to buy or sell or otherwise deals in options on businesses;
    (4) advertises or represents himself as a business broker;
    (5) assists or directs in the procuring of prospects intended to result in the purchase, sale, or exchange of a business;

> (6) offers, promotes, lists or agrees to offer,
> promote, or list a business for sale, lease, or exchange.

815 Ill. Comp. Stat. 307/10-5.10.

It is undisputed that Equity regularly provides business brokerage services and, therefore, is "required to register under Section 10-10 of [the] Act." *See* 815 Ill. Comp. Stat. 307/10-10 ("Every person engaging in the business of business brokering shall be registered with the Office of the Secretary of State pursuant to the provisions of this Act."). But the fighting issue here is whether, in its 2015 work for Zylstra, Equity was acting as—providing "the services of"—a business broker. *See* 815 Ill. Comp. Stat. 307/10-35. This depends on whether Equity's services were the kind of conduct described in subsections (1)–(6) of the "business broker" definition. *See* 815 Ill. Comp. Stat. 307/10-5.10. And this issue—the parties agree—depends on whether Equity's services in 2015 involved negotiating the sale of a "business."

The Act contains this definition of a "business":

> an existing business, goodwill of an existing business, or *any interest therein*, or any one or combination thereof, where the transaction is not a securities transaction involving securities subject to the Illinois Securities Law of 1953, and wherein the sale or exchange of real estate is not the dominant element of the transaction.

815 Ill. Comp. Stat. 307/10-5.15 (emphasis added) (footnote omitted).

Zylstra focuses on the words "any interest therein." Zylstra contends that, through the promissory notes, it retained an "interest" in "an existing business," the St. Charles dealership. So, Zylstra argues, when Equity negotiated payoff of the notes, Equity negotiated the sale of an "interest" in the dealership.

Equity disagrees. It argues the sale of the dealership was complete in 2011. So, in Equity's view, Zylstra retained no interest in the dealership. And so, Equity maintains, its efforts to negotiate payoff of the notes could not have involved the sale of any "interest" in the dealership.

Neither the parties, nor we, have found a case that cleanly resolves this dispute. But we agree with Zylstra that "undefined terms" in the Act should "be given their ordinary and popularly understood meanings." *People v. Ward*, 830 N.E.2d 556, 560 (Ill. 2005). And we recognize the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Corbett v. Cnty. of Lake*, 104 N.E.3d 389, 396 (Ill. 2017) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)).

Applying these principles here, we do not think the 2015 payoff of the promissory notes involved a sale of any interest in the dealership. Certainly we agree with Zylstra that "interest" means different things in different contexts. *See Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 328 (Tex. 2017) ("Thus, when interpreting broad, context-sensitive terms such as 'interest,' we must be sensitive to the context.").[1] Here, context requires us to decide what "interest"—if any—in the dealership could have been *sold* by Zylstra

---

[1] For example, as Zylstra points out, "interest" could mean "any aggregation of rights, privileges, powers[,] and immunities." Or it could mean the rate of return—the "interest" rate—on a savings account. Or it could mean something like attention, as in this sentence: "Before DeAndre's death, . . . his biological father[] showed little interest in his son." *Rainey v. Chever*, 527 U.S. 1044, 1044 (1999) (Thomas, J., dissenting). The meaning *depends* on the context. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning.").

in 2015.   A "sale" involves a transfer of *property* in return for payment.  *See Sale*, Merriam-Webster, https://www.merriam-webster.com/diction ary/sale (defining "sale" as "the act of selling," "*specifically*: the transfer of ownership of and title to property from one person to another for a price").[2]  So, if the 2015 payoff involved the sale of an interest in the dealership, the payoff must have involved a transfer of some *property* interest in the dealership.  But it did not. Zylstra had already sold the dealership back in 2011.[3]  By 2015, Zylstra had no

---

[2] Many cases recognize that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent."  *Comm'r v. Brown*, 380 U.S. 563, 571 (1965) (quoting *Iowa v. McFarland*, 110 U.S. 471, 478 (1884)); *see also Rochlis v. United States*, 146 Fed. Cl. 743, 794 (2020) ("When interpreting the Internal Revenue Code, 'the term "sale" is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money.'" (citation omitted)); *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019) ("And the ordinary meaning of 'seller' is 'one that offers [property] for sale,' with 'sale' defined as 'the transfer of ownership of and the title to property from one person to another for a price.'" (alteration in original) (citation omitted)); *Julian v. Dep't of Revenue*, 118 P.3d 798, 801 (Or. 2005) ("A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." (citation omitted)).

We raise two side notes.  First, although not relevant here, the ordinary meaning of "sale" can also encompass *agreements to* transfer property.  *Levit v. Bowers*, 119 N.E.2d 536, 538 (Ill. App. Ct. 1954) ("The word 'sale' means generally the actual transfer from a seller to a purchaser.  It is often used, however, to signify the conclusion of negotiations even though final transfer has not been made."). Either way, though, a transfer of property must be contemplated.

Second, as Zylstra points out, regulations under the Act state: "'Sale or Sell' means every contract or agreement of sale, contract to sell, or the disposition of a business or interest in a business for value."  Ill. Admin. Code tit. 14, § 140.51(a). For present purposes, we see no conflict between this regulation and the ordinary meaning of "sale" as explained above.

[3] This particular fact—that Zylstra sold the dealership in 2011—is central to our resolution of this case.  But Zylstra adamantly disputes the point.  Zylstra claims that "Equity['s] . . . contention that the sale was completed in 2011 *is simply wrong*." (Emphasis added.)   Yet, in a December 2017 statement of undisputed facts, Zylstra stated "[t]he sale of the St. Charles [d]ealership finally closed in 2011 for $11.5 million."  And in a March 2019 statement of undisputed facts, Zylstra referred to "the 2011 [s]ale" of the dealership and noted the dealership "was sold" in May 2011.

property interest in the dealership—it had nothing to sell. So, in 2015, Zylstra could not have sold any interest in the dealership. And Equity could not have negotiated a sale on Zylstra's behalf.[4]

In short, the 2015 payoff of the promissory notes was not a sale of any business or any interest in any business. So, although Equity is a registered business broker, Equity was not acting as a business broker when it helped negotiate the 2015 payoff. And so, for purposes of the Act, the alleged 2015 contract between Equity and Zylstra was not a "contract for the services of a business broker." *See* 815 Ill. Comp. Stat. 307/10-35. And the Act did not require the contract to be in writing and signed. *See id.*

We conclude the district court erred in granting summary judgment. We reverse and remand for further proceedings.

**REVERSED AND REMANDED.**

---

[4] Zylstra argues that, because it still held the promissory notes after 2011, it continued to own a "portion of"—or an "asset of"—the dealership. "As a result," Zylstra argues, it did not sell its "last interest in the [dealership] business" until the "final agreement" in 2015. We disagree. Like Equity, we believe the promissory notes were unsecured debt. This means no "[p]roperty [was] pledged as security against a debt." *See Collateral*, Black's Law Dictionary (11th ed. 2019); *Unsecured Debt*, *Black's Law Dictionary* ("A debt not supported by collateral or other security."). Certainly the record does not suggest the notes were secured by any "portion of"—or any "asset of"—the St. Charles dealership. And so Zylstra did not transfer any "portion of" or "asset of" the dealership in return for the 2015 payoff.